Valentine *v.* Stewart.

## VALENTINE *et al. v.* STEWART *et al.*

A STATEMENT on motion for a new trial, regularly settled and signed by the Judge, and containing all the grounds of the motion, but without any specification thereof, may be. amended by the Judge, so as to insert a specification of the grounds of the motion, after the time for filing a statement has passed.

Such an amendment, adding no facts or exceptions, cannot affect the merits, and its allowance is in furtherance of justice, and matter of discretion, not of power.

There were pending before the Board of U. S. Land Commissioners three cases— No. 558, Nos. 45 and 812. The claimants in No. 558 entered into a written agreement with V., the claimant, and B., his attorney of record in cases Nos. 45 and 812, by which the former agreed to pay to V. a certain portion of the proceeds of the sales of that portion of the claim No. 558, known as the Miranda claim, the parties agreeing to appoint an agent to go on and make sales. Contemporaneous with this agreement was another between the same parties, by which V. and B. agreed to withdraw and discontinue claims Nos. 45 and 812 before said Board, and also to cause to be withdrawn the depositions of Theodore Miranda and Francisca Miranda, taken before a Commissioner in said case, No. 558, and on file therein ; and to use their "best endeavors to procure the confirmation of said claim No. 558." B. was the attorney for the Miranda claim, which was for the same land as claim No. 558. To defeat claim No. 558 he acted for the U. S. Law Agent, in taking said depositions, which were important to the Government in defeating claim 558, and he attempted to carry out his agreement to withdraw said depositions—though he was not

Valentine *v.* Stewart.

directly retained by the Government. V. and B. sue for the specific execution of the agreement. *Held,* that such agreement is against public policy, and cannot be enforced ; that B. could not, without a violation of his duty to the Government as an attorney, carry out such agreement.

An attorney after once acting as such in the prosecution of a suit, and having opportunities for knowing the facts of his client's case, cannot go over and render assistance to the adverse side, and then enforce, in a Court of Equity, a contract based on such assistance.

An attorney, when acting for his client, is bound to the most scrupulous good faith. Even where the attorney purchases the subject of the suit, the client may set the purchase aside at will, unless the attorney show by clear and conclusive proof, that no advantage was taken, that everything was explained to the client, and that the price was fair and reasonable.

*Held,* further, that the depositions having become regularly a part of the records of the Land Commission, and the Government being thus entitled to use them, like other public archives, the agreement to withdraw them, and thus to interpose obstacles to the exercise of this right of the Government, is contrary to public policy and void, and this, whether the depositions were true or false, or whether the Government would be benefited or not by their possession.

There is no difference, in principle, between a contract to keep a witness out of the way, and an agreement to suppress and get from the archives or offices of the Government a deposition—a knowledge of which may be important to the Government.

If any part of the consideration of an agreement be void, as against public policy, the whole contract fails.

Courts should, of their own motion, dismiss a case based upon a consideration which contravenes public policy, whether the parties to the suit take the objection or not.

APPEAL from the Seventh District.

The facts appear in the opinion of the Court. Plaintiffs appeal.

*Shafter & Heydenfeldt,* for Appellants.

I. The facts set up in this bill were sufficient to entitle the plaintiffs to a decree of specific performance—a contract made by the defendants in favor of the plaintiffs, concerning land, and various breaches of that contract. It has at no time been contended, that the facts alleged did not sustain the prayers for relief, and as the Court below was with us on this point we need not argue it here. The contract and breaches were admitted by the answers, and unless the matters set up in the answers were sufficient to avoid the case made in the bill, the plaintiffs were entitled to a decree.

II. The defendants set up various allegations of fraud, mistake,

Valentine *v.* Stewart.

&c., in respect to the plaintiffs' title; all these defenses were bad in law, and the plaintiffs were entitled to the decree prayed for upon the pleadings alone.   As the Court below were with us also in this respect, we need not argue this point.

III.   The evidence introduced by the plaintiffs fully sustained the allegations of their complaint.   The evidence introduced by the defendants entirely failed to sustain the allegations of their answers in avoidance of the plaintiffs' case.

Upon the pleadings and proof the plaintiffs were, therefore, entitled to a decree in their favor, and on this point also the Court below was with them.

IV.   But the Court below founded its decree upon supposed fact or facts, no where alleged in the pleadings.   This was clearly erroneous. A Court of Equity cannot found its decree upon a fact not alleged in the pleadings, however clearly it may be made out in evidence. (*Insham* v. *Child*, 1 Brown R. 92; *Sydney* v. *Sydney*, 3 P. Wms. 264; *Whaley* v. *Norton*, 1 Ver. 483; *Clarke* v. *Turton*, 11 Vesey, 240; *De Tastel* v. *Le Taverner*, 1 Keene, 170; *Hall* v. *Maltby*, 6 Price, 240; *Mulkholand* v. *Hendrick*, 1 Molloy, 359; *Farrel* v. ——, 1 Molloy, 353; *Malcine* v. *Scott*, 3 Hare, 63; *Whitely* v. *Martin*, 3 Beav. 226; *Graham* v. *Oliver*, 3 Beav. 124; *Fitzgerald* v. *O'Flaherty*, 1 Molloy, 347; *Smith* v. *Burnham*, 3 Simons, 612; *James* v. *McKennon*, 6 Johns. 562; *Forsyth* v. *Clarke*, 3 Wend. 653; *Stuart* v. *Mech. & Farms. Bank*, 19 Johns. 505; *Beach* v. *Fulton's Bank*, 3 Wend. 584; *Wright* v. *Dame*, 22 Pick. 55; *Shelby's Ex'rs.* v. *Shelby's Devisees*, 1 B. Mon. 278; *Thompson* v. *Thompson*, 2 B. Mon. 174; *Wesley* v. *Thomas*, 6 Harris, 224; *Watkins* v. *Stocket Adm'rs.* 6 Harris, 435; *Booth* v. *Booth*, 3 Litt. 67; *Governeur* v. *Elenendorf*, 5 J. C. R. 82; *Carneal* v. *Banks*, 10 Wheat. 189; *Crocker* v. *Higgins*, 7 Conn. 342; *Buck et al.* v. *McCaughty*, 5 Men. 220; *Morrison's Ex'rs.* v. *Hart*, 2 Bibb. 7; *Limaster* v. *Burckhardt*, 2 Bibb. 26; *Smith* v. *Smith*, 4 J. Ch. R. 286; 1 Conn. 734; *Ontario Bank* v. *Root*, 3 Paige, 478; *Gaylord* v. *Couch*, 5 Day, 229; *Gregory et al.* v. *Powers' Heirs*, 3 Litt. 339; *Gowen* v. *Price*, 1 Bibb. 175; *Parrys* v. *Mansfield*, 6 Simmons, 565; *Gordon* v. *Gordon*, 3 Swanston, 472; *Parkhurst* v. *Van Cortlandt*, 14 Johns, 42; *Ex'rs. of Everton* v. *Miles*, 6 Johns. 142; *Lyon* v. *Tallmage*, 14 Johns. 516; *Denn* v. *Mason*, 4 Conn. 428; *West* v. *Hall*, 6 Harr. & Johns. 223; *Smith* v. *Clarke*, 12 Vesey, 480; *Williams* v. *Llewellyn*, 2 Younge & Jervis, 69; *Stanley* v. *Robinson*, 1 Russ & Mylne, 529; *Holden* v. *Hearne*, 1 Beaven, 445.)

Valentine *v*. Stewart.

V.   The facts assumed by the Court below as the foundation of its opinion and judgment are neither alleged in the pleadings nor made out in the evidence.   (Phil. Ev. Cowen & Hill's Notes, 3 vol. 459, note 285 ; Greenl. Ev. sec. 41 ; *M. Leod* v. *Wakely*, 3 C. P. 322 ; 6 Munroe, 116 ; Greenl. Ev. sec. 35 ; Brightley's Digest, 112–37 ; 1 Greenl. Ev. sec. 40 ; Story on Agency, sec. 462–478 ; *McLeod* v. *Wakely*, 3 C. & P. 311 ; *Hurne* v. *Long's Reps*. 6 Mon. 116 ; *Rex* v. *Inh. of Tuyning*, 2 B. & A. 336 ; 10 Adol. & Ellis, 248 ; Chitty on Contracts, 675 ; *Henden* v. *Simpson*, 2 P. Dow, 731 ; 10 A. & E. 821 ; *Edwards* v. *Grand Junction R. R. Co*. 7 Sim. 337 ; 1 Mylne & C. 650 ; *Simpson* v. *Lord*, Howden, 1 Keen. 583 ; S. C. on Appeal, 3 Mylne & Craig. 101 ; *Vauxhall Bridge* v. *Earl Spenser*, 2 Maddox, 527 ; S. C. on Appeal, 1 Jac. 64 ; Chitty on Con. 59 ; 1 Par. on Con. 382, 383.)

A doubtful matter of public policy is not sufficient to invalidate a contract ; an agreement is not void on this ground, unless it expressly and unquestionably contravenes public policy, and be manifestly injurious to the interest of the State.   (Chitty on Con. 663 ; 2 Burg. 242 ; 9 Mon. 464 ; 1 Ball & B. 338 ; Chitty on Con. 659 ; Id. 79 ; *Goldshede* v. *Swan*, 1 Exch. 154 ; 2 Par. Con. 78 ; *Ex'rs. of Chamber* v. *Smith*, 3 Desau, 12 ; *Bartin* v. *Rushton*, 4 Desau, 373 ; *Shelby's Heirs* v. *Shebly's Devisees*, Coke, 181 ; *Meredith* v. *Meredith*, 1 A. L. Marsh, 600 ; 3 Cowens & Hills ; Phil. on Ev. 459, note 285 ; Id. 649.)

VI.   But it is contended, that an exception exists in respect to contracts against public policy, and that whenever it appears to a Court that a contract which is brought before it is against public policy, it will refuse to entertain any suit upon it.

There is no such exception.   It is true, that when it so appears to the Court, the Court will eject the cause ; but then, nothing appears to the Court that is not on its record.   But if it is meant to assert, that a Court will decide a contract to be *turpis contractus*, when no fact is alleged upon the record which makes it so, there is no foundation for the assertion.   Nearly all the cases which we have cited are cases where it was urged that the contract was illegal on the ground of fraud or some other wrong, and many of the cases are those in which it was alleged that the contract was void, as against public policy.

VII.   The Court below erred in the principles of law upon which it based its decree.   (*Johnson* v. *Marriott*, 2 Dowl. P. C. 343 ; 4 Tyr. 78 ; 2 M. & Scott, 568 ; 1 Jacob, 300 ; 8 Sim. 262 ; 19 Ves. 261 ; 9 Bing. 1.)

Valentine *v.* Stewart.

But even if the evidence of the two depositions is received, and the fullest effect given to it, there is no *turpis contractus* proved.  A contract may be unlawful on either of three grounds.  1. That the thing promised is forbidden.  2. Or if that is not forbidden, then that the consideration is forbidden.  3. Or if neither are forbidden, then on the ground that neither the consideration or promise can be executed by the party, by reason of his peculiar character or position.

The contract here is free of illegality on all of these grounds.  There is no pretense of any illegality in the contract set up in the complaint; but it is contended, that the contract set up in the answer forms the consideration of the other, and that one of the promises contained in it is illegal.  But nothing in this contract is illegal.

1. The promise of Brooks to discontinue the Miranda claim is not forbidden.  No public policy required its prosecution; its discontinuance could work no harm to the Government—all the harm would fall on the head of the claimant.

2. The agreement to withdraw the depositions was not unlawful in itself.  The agreement was, in effect, to move for leave to withdraw.  The making of such a motion is not forbidden.  It is not a *malum in se.*  It is not a *malum prohibitum.*  It might be unwise, bootless, impracticable, but it was not unlawful.

3. But it is said, that although the act was lawful in itself, still the promise to perform it was unlawful, because the intention of it was to suppress evidence.  It is of no moment with what intention a man agrees to do a lawful act.  But there could have been no intention to suppress evidence, for the depositions were not evidence.  It was a fraud upon the Court and the party to take and file them, and their removal was remedial of that wrong.  Nor can it be said, that the agreement had for its object to suppress a clue to testimony, for this assumes that the clue was a secret clue, known only to the confederate.  But the Comissioner, Lott, took the depositions, and the Law Agent was present on behalf of the Government, and besides, the application was to be made, and was made, at a public session of the Board, when the attention of the Law Agent, and of all the Board was particularly directed to them.

If, then, there was any illegality, it must be on the ground that Mr. Brooks stood or had stood in a position—bore or had borne a character that made it unlawful for him to agree to discontinue the suit, and withdraw the depositions, though it might have been lawful for another.  It

Valentine *v.* Stewart.

is not contended that he could not agree to withdraw the Miranda claims, but it is contended that he could not agree to withdraw the depositions in the Ortega suit—for he stood, or had stood in a position of public trust; he had himself acted as Law Agent in taking the depositions. He had acted for the Government in the case, in the matter of taking the depositions.

It is not pretended that he was ever Law Agent *de jure;* neither was he Law Agent *de facto.* (*Wilcox* v. *Smith,* 5 Wend. 431 ; *Plymouth* v. *Painter,* 17 Conn. 585.) He " did not exercise the office "— " under color of an appointment, by the appointing .power ; " nor was there that " public acquiescence " which the rule requires.

Affirmatively, he was what his acts import—not general employer and general employee, even in that suit, but special employee in a particular transaction. But even that limited service so performed for the agent, was not service rendered in the case, but out of it. Nor was the service performed for the Government, or in aid of the law or of its just administration, for the depositions were illicit, and they were illicitly there against the law, and therefore, against the will of the Government—*subversive of public justice, instead of being promotive of* it ; against public policy, instead of following its lead. It was not for the Government, for another reason, it never could be beneficial to it. It follows, therefore, that Brooks never did occupy the position which the Court below assigned him. In all that he did, he acted as the attorney of Valentine.

It does not follow from these facts, that the plaintiff was associated with the Law Agent, or that any trust or confidence was reposed in him, or that he was retained generally in the case. The giving of the notice in the name of the Law Agent, and at his request, was a mere clerical act, which implies no confidence or trust. He was bound to do that act properly, but he was under no obligation whatever to render any other, or even that service, a second time. He had a perfect right to accept employment from the other side the next moment. So in regard to the attending for him on the examination of the two witnesses. It was a mere friendly act, which any lawyer renders for another whenever that other happens to be engaged otherwise, and we do not see how a general retainer in the cause can be presumed from it.

But if it should be conceded that Brooks, by serving the notice, and taking depositions at the Agent's request, after the case was finally submitted to the Board, acted for the Government, the question comes,

Valentine *v.* Stewart.

did any relation of trust exist at the date of the contract ? That is the *factum probandum*, and they have the burden. They cannot show that such relation then existed, for they have not shown that a relation ever existed, giving rise to a presumption of continuance. What is a relation or *status* ? Permanency is of the essence of it—as the relation of father and son, husband and wife, guardian and ward, etc. The presumption of continuance goes upon a *status* proved. (1 Greenl. on Ev. secs. 41, 42 ; *McLeod* v. *Wakeley*, 3 C. & P. ; 14 E. C. L. 322, 311.) But the presumption of innocence overcomes even this.

If it could be presumed from these two acts, that the plaintiff was retained generally, as an associate of the Law Agent, upon the days of the happening of these acts, the Court cannot therefrom presume that the retainer continued. On the contrary, the Court is bound to presume that that connection had terminated. We admit that, as a general rule, a condition shown to exist once is presumed to continue, but this presumption gives way before the presumption of innocence. But here a dissolution of the relation is proved. Brooks elected to dissolve it, and gave the Agent notice in fact. The Law Agent made no objection. He responded to it, by recognizing and dealing with him as an adversary.

But assuming that Brooks was under some sort of obligation as to the depositions, however slight and shadowy, the contract would not, even then, be unlawful, unless it was understood that the removal was to be effected by violence or guile. But there is no pretense that the removal was to be effected by unlawful means. This is not to be presumed, and the burden of proof is on the defendants. It was to be done, and was done in public session of the Board, and Howard approved of the course pursued. The Law Agent was present for the Government, not objecting to the right or propriety of Brooks' making the motion, but opposing it on its merits.

*D. O. Shattuck*, for Respondents.

I. If any part of the entire consideration of a contract is illegal, or against sound morals or public policy, the whole is void. (*Crawford* v. *Morrill*, 8 Johns. 253 ; *Carleton* v. *Whitcher*, 5 N. H. 196 ; *Hinde* v. *Chamberlin*, 6 Id. 225 ; *Armstrong* v. *Toler*, 11 Wheat. 258 ; *Donallen* v. *Lennox*, 6 Dana, 91 ; *Himeburg* v. *Summer*, 9 Vt. 23 ; 1 Chitty's Prac. 832–836 ; *Howden* v. *Simpson*, 10 Adol. & Ellis, 821 ; *Abbé* v. *Marr et als.* 14 Cal.)

II. A Court is the guardian of sound morals and public policy, as it is of its own jurisdiction, and whenever it is called upon to enforce a contract, which upon its face or by the evidence adduced, is found infringing upon either of them, it will be noticed, and the Court will refuse its aid to enforce it. (*Barth* v. *Nutt Adm'r.* 4 Pet. 184; *Craig* v. *State of Missouri*, Id. 410; *Viser* v. *Bertrand*, 14 Ark. [1 Barber] 269–277; *Holman* v. *Johns*, 1 Cowp. 343; *Niles* v. *Clarke*, 20 Wend. 30–31–32, 24; *Thalimer* v. *Brinkerhoff*, 20 Johns, 384.)

III. The contract now sought to be enforced, is against public policy and sound morals, and is void. (Comyn on Con. 53, citing, 1 Leonard, 180; *Woods* v. *McCann*, 6 Dana, 266; *Fuller* v. *Dana*, 18 Pick. 472; *Pingay* v. *Washburn*, 1 Ark. 264; *Sharpe* v. *Teese*, 4 Halst. 352; *Craig* v. *The State of Missouri*, 4 Pet. 410; *Bartle* v. *Colman*, 4 Id. 184; *Gulick* v. *Ward*, 5 Halst. 87; Chitty on Con. 573.)

*Crockett & Crittenden*, also for Respondents.

The only question is, whether the fact appearing by evidence properly given under the issues raised by the pleadings, that the consideration was an immoral one and the contract one which is against public policy, the Court should refuse to enforce performance where the objection is not specifically raised and made a ground of defense.

Upon that question, we submit that the authorities heretofore cited by respondents are conclusive. As Lord Mansfield says in *Holman* v. *Johnson* (Cowp. 343); "The principle of public policy is this—*Ex dolo malo non oritur actio.*"

Where the objection exists and comes to the notice of the Court, the defendant's express waiver of it would be ineffectual.

It is not his interest which the Court seeks to protect. It only is to vindicate the law and enforce sound morality.

The distinction which exists between cases of this sort and those in which there is fraud upon the rights of the individual alone, is perfectly clear.

In the latter class of cases, the fraud is a defense only when it is made one by the pleadings, and it may be waived by the defendant, and is waived when not distinctly set up.

Many authorities are quoted in appellants' brief, to the point that fraud is not to be presumed, but that innocence is presumed till rebutted. But it never was intimated as a principle of law that innocence was to be presumed when fraud was proven. The respondents rely

upon no presumptions, but upon positive and satisfactory proof, or rather, the Court below decided not upon presumption but proof.

The idea that Brooks appeared for Valentine is preposterous. Valentine was not a party, and the Board had refused, they say, to allow him to become a party. There were but two parties—Charles White on one side, and the United States on the other. Brooks certainly did not appear for White. He must therefore have represented the United States.

It is wholly immaterial whose interest he was serving by his appearance, or who paid him for it. In a controversy between A and B, it may be C's interest that A should succeed ; suppose that interest should induce him to employ counsel to appear for A, and counsel so employed and paid by C should appear and conduct A's suit, would the same counsel be permitted to swap sides and agree to undo all that he had done for A, merely because he had become A's counsel under the employment of C and for C's interest?

It is unnecessary to follow the appellant's counsel through his several ingenious subdivisions of the grounds of the illegality of a contract. The Court will perceive that the mode of reasoning there indulged in would enable a person to prove any thing. In reply to the whole of it, we say the contract on the part of Brooks was unlawful, because he undertook to do that which he was prohibited from doing by law, and by every principle of fairness and honesty. He had been the attorney of the United States, in that capacity he took the depositions and he agreed to support them. Ingenuity is absolutely wasted in attempting to uphold such a contract.

We do not contend that he was ever Law Agent *de jure*, or *de facto*, but that he was the attorney of the United States. It makes no difference whether the United States ever had, or had not, any Law Agent, nor whether Brooks had authority to appear or not. He did in fact appear, and he is estopped by his own act from saying that he was not the attorney of the Government in this matter.

Notwithstanding the appellants' counsel have cited authorities upon the point, we shall not discuss the question whether or not an attorney who has been employed by one party and conducted his cause, can accept a retainer and appear for the other side, or whether if he should do so it is only a matter between himself and his former client, but not in violation of any rule of public policy or fair dealing. If the rule be as stated by appellants' counsel, it is time it should be changed, and we

Valentine *v.* Stewart.

feel assured it would be. But we apprehend that this Court, in declaring such not to be the rule, will only be doing what has often been done before.

On motion to reject the statement, COPE, J. delivered the opinion of the Court—FIELD, C. J. and BALDWIN, J. concurring.

A motion is made in this case to reject the statement on the motion for a new trial. The judgment was rendered on the eighteenth of October, 1858, and within two days thereafter plaintiffs served a notice of their intention to move for a new trial. On the fourth of December, a statement on the motion for a new trial was settled and signed by the Judge, and this statement being regular on its face, the signature of the Judge is presumptive evidence of the regularity of the previous proceedings. To rebut this presumption, and establish the invalidity of the statement, the defendants bring up a bill of exceptions subsequently signed by the Judge, showing that the original statement did not contain a specification of the grounds of the motion, and that such specification was inserted by way of amendment, after the time for filing a statement had elapsed. Passing by the question as to the admissibility of this mode of assailing the statement, we think the bill of exceptions fails to disclose any error or omission affecting its validity. The original statement was incomplete, but it was not a nullity. It was perfect except in the particular referred to, and contained, in fact, all the grounds of the motion. It omitted merely the formal requisite of a specification of those grounds. In that respect alone, it was amended; not a fact or exception was added. Nothing additional was interposed that could in any manner affect the merits of the motion. The amendment was clearly in furtherance of justice, and its allowance by the Judge was a matter of discretion, and not, as we think, a question of power. *Johnson* v. *Whitlock* (3 Kern. 344) is a strong case in support of this position. The Court say: "If this statement has been imperfectly made, we have no doubt of the power of the Supreme Court to direct a resettlement, and reform the proceedings in any manner not inconsistent with the actual finding of the Judge or Referee upon the facts. The facts, as found, cannot be changed and found differently; nor can leave be had to insert exceptions never in fact taken; but within these limitations it will always be proper to move in the Supreme Court, not to turn the case into a bill of exceptions—a proceeding which has no existence under the code—nor into a

special verdict, but so to amend the case itself as to fitly present the questions which are to be examined in this Court."

It follows that the statement was properly made and settled, and the motion to reject is denied.

On the merits, BALDWIN, J. delivered the opinion of the Court—COPE, J. concurring.

This is a case of more than ordinary importance, and presents features of peculiar interest. The plaintiffs file a bill for the specific execution of a certain agreement, which they set out. Upon the pleadings and proof, the District Judge dismissed the bill, upon the ground that the agreement, as disclosed in the proofs and the facts connected therewith, showed that the contract sought to be enforced was in contravention of public policy and void, and that the Court would refuse to execute it, though this defense was not specifically or otherwise set up in the pleadings.

The agreement set up in the complaint, is as follows : " Memorandum of agreement made this twenty-ninth day of January, in the year of our Lord one thousand eight hundred and fifty-five, between James F. Stewart, G. B. Post, George F. Upham, Joseph A. Post, Volney E. Howard and E. O. Crosby, representing and prosecuting claim No. 558, before the United States Land Commissioners for settling private land claims in California, parties of the first part, and Thomas B. Valentine, claimant, and Benjamin S. Brooks, Esq., Attorney of Record in cases Nos. 45 and 812, on the docket of said United States Land Commissioners, parties of the second part.

" The said parties of the first part, for and in consideration of the sum of one dollar to them in hand paid, and of divers other good causes and considerations them thereunto moving, have covenanted, promised and agreed, and by these presents do covenant, promise and agree to and with the said parties of the second part, their executors, administrators and assigns, in manner and form following : That upon request after the execution of this indenture, they will appoint an agent to make sales of land described in said claim, and after deducting expenses, all moneys received for said lands shall be divided as follows : For the sale of that portion of the claim known as the lower half of the Miranda claim, one-third of all moneys received shall be paid over to Thomas B. Valentine, for the benefit of whomsoever it may concern; and for the sale of the balance of the claim No. 558, one-half of the

proceeds shall be paid over to Thomas B. Valentine, for the benefit of whomsoever it may concern. And we, the parties of the first part, agree with each other, that we will each deduct from our interests which we now have, or may have in consequence of a confirmation of said claim No. 558, that proportion which our interests bear or may bear to the amount that may be paid over to Thomas B. Valentine under and in pursuance of the foregoing agreement.

"It is further agreed, that in the appointment of the above agent, and in the prices to be fixed for the sale of lands above described, Thomas B. Valentine shall be consulted according to the interest he may have and may represent in the matter, and if any disagreement shall arise as to the appointment of said agent, or as to the prices to be put upon said land, the same shall be settled by arbitration."

Cotemporaneously an instrument was executed by Valentine and Brooks, in these words: "This agreement, made this thirtieth day of January, in the year of our Lord one thousand eight hundred and fifty-five, between Thomas B. Valentine, claimant, in cases Nos. 45 and 812, before the U. S. Board of Land Commissioners, and Benjamin S. Brooks, Esq., Attorney of Record for said claimant therein, of the one part, and James F. Stewart, G. B. Post, George F. Upham, Joseph A. Post, Volney E. Howard and E. O. Crosby, of the one part, witnesseth: that the said Valentine and Brooks, for and in consideration of the sum of one dollar to them in hand paid, and of divers other good causes and considerations them thereunto moving, have covenanted, promised and agreed, and by these presents do covenant, promise and agree to and with the said James F. Stewart, G. B. Post, George F. Upham, Joseph A. Post, Volney E. Howard and E. O. Crosby, their executors, administrators and assigns, in manner and form following, that is to say: That the said Valentine and Brooks will withdraw and discontinue the said claims Nos. forty-five (45) and eight hundred and twelve (812) before said Board at the next public session of said Board, and will also cause to be withdrawn the depositions of Theodore Miranda and Francisca Miranda, taken before Commissioner Lott, January 15th and 17th, in said case number five hundred and fifty-eight, and will use their best endeavors to procure the confirmation of said claim number five hundred and fifty-eight (558)."

To understand the connection of Mr. Brooks with the case of *Charles White* v. *The United States*, depending before the Board of United States Commissioners to settle Private Land Claims in California, it is neces-

Valentine v. Stewart.

sary to refer to some of the facts in the record. It seems that Brooks was the attorney of the claimant of the Miranda claim, so called, as mentioned in the agreement, and was engaged in the prosecution of that claim. That claim was for the same land as White's or the Ortega claim (No. 558); and the Miranda claimants were interested in defeating the Ortega claim—1st. That it might be got out of the way of their own claim, in order that this might be recognized, or might be more promptly or readily recognized; and again, to prevent any interference afterward, if, as was sometimes the case, both claims were confirmed. It does not appear that Brooks, by any direct retainer on the part of the United States, was engaged to assist the Law Agent in contesting the Ortega claim. On the sixteenth January, 1855, Mr. Brooks gave a written notice to the. attorney of the Ortega claim, that he would, that day, take the depositions of two persons named Miranda, to be used in the case on behalf of the Government. The notice was signed " McKune, Law Agent, per B. S. Brooks." The depositions were taken by Peter Lott, Commissioner for the Commission, who recites in the deposition, that the Law Agent was present, and that the witnesses were examined for the Law Agent by Mr. Brooks. The depositions seem to bear directly upon the matters in litigation in these rival claims, and contained very strong evidence against the validity of the claim of Ortega. It seems that before these depositions had been taken, the claim of Ortega (White's) had been submitted. After the taking of this testimony, the Law Agent moved the Board to open the case for further testimony upon an affidavit showing cause therefor, and accompanied the petition with these depositions of the Mirandas. But the application was refused. It appears by the testimony of Mr. Howard, that Mr. Brooks opposed him in taking testimony in the Ortega claim, and that he understood this was done by the consent of the Law Agent to assist the Government, for the reason that he represented the Miranda claim. Indeed, the whole testimony of the case goes to establish unquestionably the fact that Brooks was the agent and attorney of the Miranda claimants; that he opposed this claim of Ortega as such; that he acted under and attempted to carry out the agreement to withdraw the deposition filed in the Ortega case. There is as little doubt that those depositions, and the knowledge of the contents of them, were important matters to the Government in opposing this Ortega claim. The testimony of Mr. Williams fully establishes this fact. Substantially upon this state of the case, the learned Judge below held that

the agreement before set out was in violation of public policy, and the propriety of that decision is attacked by the first assignment of errors.

It has been seen that the agreement of Brooks and Valentine stipulates for two things :—1st. That they will cause to be withdrawn the depositions of Theodore Miranda and Francisca Miranda; and 2nd. That they will use their endeavors to procure the confirmation of the Ortega grant.    Could Brooks, without a violation of his duty to the Government, caused by the relation which he bore to it, carry out this agreement?    It is wholly unnecessary to consider whether Brooks was regularly retained by the United States or not.    His profession was that of an attorney, and he was acting as such for the Miranda claimants.    He thought the best way to prosecute his own claim, was by assailing the rival claim of Ortega.    We do not understand from the testimony that the only act Brooks did was giving the notice and taking the depositions of the Mirandas.    These were acts showing this relation, but the testimony of Mr. Howard goes further, and shows that Brooks was acting as the attorney with Mr. McKune, the Law Agent, in opposing the Ortega claim ; and if such were not the fact, and if Brooks' agency went no further than this special act, this could, and perhaps would have been proved.    But in the important matter of taking the testimony of the Mirandas, which gives a detailed and elaborate history of these rival claims, if the testimony be true, the attorney examining the witnesses could not have performed his office without a thorough acquaintance with the facts of the case.    He must have known upon what legal propositions the United States would rely to defeat the claim.    It is not to be supposed that in this important matter, the United States Agent failed to communicate with his associate, nor that the associate had not the confidence of the officer of the Government.    Mr. Brooks had every opportunity, then, of getting possession of the entire case of the Government.    He had the position, and with it, the confidence and privileges of counsel for the Government ; and he could do no act inconsistent with the character which he assumed.    It may be very true that he was not bound to continue his relation to the Government; that having acted as attorney in its behalf for personal objects, and, so far as the Government was concerned, gratuitously, he might withdraw when he chose from this voluntary service.    But this is a very different thing from availing himself of his former position for the purpose of making a profit to himself at the expense of the Government.    The understanding between him and the

Valentine *v.* Stewart.

Law Agent was not that he should assist in contesting the claim until he saw he could make more by going on the other side. He had, as counsel of the Government, been put in possession of the case of the Government; had taken testimony in the name and as the agent of the Government. The object and the intended effect of this testimony were to defeat the claim; he could not, afterward, in consistency with the position, render any assistance to White and Stewart to maintain the claim. The obvious consequences of such a principle would be to encourage the intermeddling of attorneys in claims of this sort, and then having got full information and knowledge of the case, proceed to dispose of that knowledge for their own profit to the other side. The true rule is, that an attorney, when acting for his client, is bound to the most scrupulous faith, to *uberrima fides.* His own interests, for wise reasons, are not allowed to be brought in collision with the interests of his client. There can be no antagonism between these parties as to the matters of this delicate agency; the attorney is simply the representative of his client—not his rival or competitor—acting for the principal, not for himself. Very little knowledge of human nature is required to convince us, that if the law allowed the attorney to deal with the principal as he might with a stranger, these responsible trusts upon which the interests of society so much depend, would be turned into means of the grossest fraud and oppression. The law has, therefore, prescribed strict rules of restraint upon the action of the attorney, and will never permit him to take advantage of his position to speculate upon the interests which are entrusted to him. Even in the case of a purchase of the subject of the suit by the attorney, the client may set it aside at his pleasure, unless the attorney show by clear and conclusive proof that no advantage was taken, that everything was explained to the client, and that the price was fair and reasonable. But no case has come to our knowledge where an attorney has been permitted, after once acting as such in the prosecution of a suit and having opportunities for knowing the facts of his client's case, to go over and render assistance to the adverse side, and enforce, in a Court of Equity, the contract, based on such acts, or the agreement to do them.

But this whole agreement must be taken together, that is, the stipulation to do whatever he could to enforce the Ortega claim, and the stipulation to withdraw the depositions of the Mirandas from the United States Board of Land Commissioners. We offer no comment on the fact of Mr. Brooks' agreeing to do all he could to give effect to the

Ortega claim, which he had taken such strong proof to show was fraudulent and worthless, and to receive, on consideration, a part of the same claim.   He might have discovered that the witnesses were mistaken.   But the fact appears very prominently in this record, that the testimony of those witnesses was considered very important; perhaps it was the only proof against the Ortega claim.   It had been taken by Mr. Brooks, acting for the Government of the United States, and after the cause had been submitted to the Board.   The testimony, therefore, had not been read on the hearing.   It is not likely that the knowledge of the contents of these papers was general.   The witnesses were Mexicans, not speaking the English language, and they seem to have been strangers in San Francisco, whose place of residence might not easily be discovered.   The claim in controversy embraced a very large and valuable estate.   It is hardly presumable that the parties would have gone to the trouble of putting this singular provision into a contract of this sort, if they did not attach more importance to it than seems now ascribed.   The truth is, we suspect that the suppression of this testimony was, if not the principal, at least, a leading consideration to the agreement; that the deposition was considered by the Ortega claimants as seriously jeoparding the confirmation of the title to the rancho; and as long as they remained on file they stood in danger of at least a renewal of the litigation, with a serious question as to the result.   If, however, the attorneys and parties through whose agency the testimony had been discovered and elicited, could be made to change sides, and the testimony itself be suppressed, probably it was considered that the confirmation of the claim would be secured. But so long as this testimony remained among the papers of the case, it might have been of little importance to the Ortega claimants to secure the assistance of the Miranda claimants and counsel.   We attach no sort of importance in this connection to the fact that at the time of this agreement and of the taking of this testimony, the case had been submitted to the Board.   We see in the affidavit of Judge McKune, upon which the motion to reöpen the Ortega case was founded, that he and Mr. Howard had agreed verbally that, notwithstanding the order of submission, testimony subsequently taken should be suffered to be read by the Board.   Whether we read these papers as mere affidavits, or as depositions regularly taken, is unimportant.   It is certain that they had come to the hands and knowledge of the Law Agent; and he makes them a portion of his affidavit or of the case on the motion to

reöpen the cause. They became, therefore, regularly a part of the records of the Land Commission; whether to be used in the decision of the case, or for what other purpose, is immaterial. Like other public archives, they might be used for any lawful purpose. The government and its officers, or any private persons, were entitled to access to them and to make use of them for any legitimate end, as proof or as information from which a knowledge of the existence and source of proofs in respect to this title could be acquired. The case was not determined at the time of filing these depositions. We are not familiar with the rules which governed the Board; but we have no doubt that the able gentlemen and learned lawyers who presided over it governed themselves by the usual course, or by a close analogy to the usual course of ordinary legal procedure. Although the case was submitted, yet we suppose—and the motion in this case supposes—it might, on a proper showing, be opened for further proof or argument. But an appeal lay to the District Court, in which case, the United States District Attorney represents the Government, and he would, of course, examine the record to see what it contained. This testimony might be of essential service on this appeal; and the Government was entitled to it for this and every other legitimate object. This statement brings us to consider, whether if the purpose and object of the agreement to withdraw this paper from the public files were as we have supposed, such agreement would be opposed to public policy.

We think it not important to notice at large the point made by appellants' counsel, that the agreement was, in effect, not to withdraw the depositions, but only to move to withdraw them. This is not the language of the stipulation; but concede that it was, we think the difference is not material. It may be true that the depositions could only be withdrawn by order of the Board, if, indeed, it possessed the power so to order, which may be doubted. But an act may be lawful in itself, or rather lawful when done for a legitimate purpose, and be wholly illegal when done as ancillary, or to give effect to an unlawful purpose. Generally speaking, a man may agree to borrow money for another, and the agreement may be enforced; but if the agreement to borrow were connected with the intended use of the money in a business interdicted by the laws, the whole agreement would be void. If, therefore, the purpose and design of this stipulation were to withdraw these documents, in order to prevent the Government using or having access to them—the Government being entitled to such use and access in defend-

ing its claims to the public domain—the agreement is affected with a fatal taint of illegality ; and this, whether the withdrawal were to be made by an order of the Court or without it; for it is the right of the Government to resort to this proof, and it is public policy to give effect to the right in the fullest and amplest manner.    Nor does it make any difference in the principle here asserted, whether the testimony of these Mirandas was true or false; or whether the Government could be benefited or not by the possession of these affidavits.    We cannot, in this collateral manner, go into this inquiry.    It is enough to say that the Government was entitled to all sources of information derived from its own archives, and any bargain or agreement to interpose obstacles to the exercise of this right, is contrary to public policy, and cannot be enforced.    We might go further than the necessities of this case require, and hold that, leaving out all question of the relation of Brooks to the case of Ortega, as attorney of the United States, this agreement would be equally void, and equally opposed to public policy, if made by him or any one else having no professional or confidential relations with the United States.    (Chitty on Cont. 581 ; 1 Chipman, 137.)    The principles of law which govern this class of cases are plain.    If any part of the consideration of an agreement be void, as against public policy, the whole contract fails.    This is well settled.    (See 1 Parsons on Cont. 380.)

It is equally well settled that Courts of Equity will never enforce any such contract.    (Comyn on Cont. 53.)    So if A promise B money in consideration that he will not give evidence in a suit depending, such promise cannot be enforced, it being unlawful for any man to suppress evidence in any case.    (Comyn on Cont. 53.)    The ground upon which Courts proceed in cases of this sort is well stated by Mr. Justice Baldwin, in the case of *Bartlett* v. *Coleman,* reported in 4 Peters, 184.    The strong language of this case is but an elaboration of the principle asserted in the case of *Holman* v. *Johnson* (3 Cowp. 343).    Lord Mansfield there says : " The objection that a contract is immoral or illegal, as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant.    It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this : *ex dolo malo non oritur actio.* No Court will lend its aid to a man who founds his cause of action upon

an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa,* or the transgression of a positive law of this country, there the Court says he has no right to be assisted. It is upon that ground the Court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So, if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, *potior est conditio defendentis.*"

The authorities and the reason of the rule leave no question as to the right of a Court, and its duty to dismiss from its consideration a case based upon a consideration which contravenes public policy. Courts do not sit to give effect to such illegal contracts. The law is not to be subsidized to overthrow itself, though the parties to the litigation may not object to such a meretricious exercise of power. If the public time and the authority of law were thus at the mercy of litigants, the sense of dignity and obligation to the laws, from which the Court derives its powers, would constrain it to desist from the suicidal task of subverting the laws which it was organized to preserve and administer.

The cases of *Coleman* v. *Sarrel* (1 Vesey, Jr. 51, and 14 Ark. R. 376) and *Viser* v. *Bertrand* are in point. The case of *Abbe* v. *Marr* (14 Cal. 210) is to the same effect, as is the reasoning of the Supreme Court of the United States, in the case before cited from 4 Peters, 184.

It follows, from what we have said, that the agreement sought to be specifically enforced is void, as being opposed to public policy; and that the learned Judge below properly dismissed the bill.

Decree affirmed.

On petition for rehearing, BALDWIN, J. delivered the opinion of the Court—COPE, J. concurring.

We deny a rehearing in this case. The appellant Brooks, in his petition, suggests that as the point upon which the case went off was not made in the Court below by the defendants, but was taken on its own motion by the Court, injustice has been done him personally and professionally, since he had no opportunity of showing the fairness and propriety of his professional conduct; and that he would have been able to do this but for this circumstance. We have no desire to reflect upon counsel in our opinions, especially when the facts are not unequiv-

ocal.   We are disposed to give to the conduct of the attorney in this case the most charitable interpretation, and to make no imputations upon his motives.   We might support our decision upon grounds wholly independent of the professional relations of Mr. Brooks to the subject, or the parties connected with this controversy.   It is evident to us that the agreement commented on in the opinion was made with the object of suppressing and getting the testimony of the Mirandas out of the way—to keep it from the knowledge of the officers of the Government; and a contract, made by any one, with this motive, and to effect this object, is opposed to public policy, and cannot be enforced.   There is no difference in principle between a contract to keep a witness out of the way, and an agreement to suppress, and get from the archives or offices of the Government, a deposition, a knowledge of which may be important to the Government.   But the other facts commented on by us in the opinion were before us, and we were bound to accord to them their legal effect, and cannot, for any purpose of the decision, consider suggestions, however probable or true we might believe them to be, if they are not furnished or supported by the record.