[No. 11255. In Bank. — February 27, 1886.]

IN THE MATTER OF THE DISBARMENT OF J. F. COWDERY.

ATTORNEY AT LAW — UNPROFESSIONAL CONDUCT — RETAINER AGAINST FORMER CLIENT. — The respondent was elected city attorney of the city and county of San Francisco, and as such had the control, during his term of office, of all litigation in which it was a party. During his term of office, certain cases against the city and county, in which judgments had been rendered against it, were appealed by him. After the expiration of his term, and while the appeals were pending, he entered into an agreement with the attorney for the adverse parties that, in consideration of a sum of money paid him, he would not allow himself to be retained in such cases by the city and county. At the time the agreement was made, the respondent had no personal knowledge of the facts or questions of law involved in the cases. While in office, he had been paid a salary as provided by law. *Held*, that the respondent was not discharged from the duty of fidelity to the city and county by the expiration of his term of office, and that the agreement not to be retained by it was a violation of this duty.

APPLICATION for the disbarment of an attorney and counselor at law. The facts are stated in the opinion of the court.

*William Matthews*, *E. R. Taylor*, and *H. J. Tilden*, Committee of the San Francisco Bar Association, for Relators.

*John F. Swift*, and *Selden S. Wright*, for Respondent.

THORNTON, J.—J. F. Cowdery, at the times hereafter mentioned and prior thereto an attorney and counselor of this court, is accused as follows: That Cowdery was in December, 1881, the attorney and counselor of the city and county of San Francisco, and continued so to be up to the fifth day of January, 1883; that while he was such attorney and counselor he took appeals in the cases of *Bonnet* v. *City and County of San Francisco* and *Parker* v. *City and County of San Francisco* from the judgments which had been given and made in each of said cases against the city and county, which appeals were pending at the expiration of his term of office; that after the expiration of his term of office and in April, 1883, he informed one D. H. Whittemore, also an attorney and counselor of this court, that there was a point in each of said causes which would be fatal to the respondents if it was presented to this court; that thereupon Whittemore, in consideration that he would not disclose the point to his successor in office, and would not be retained by said city and county to represent it in either of said cases, paid to him one hundred dollars; that he agreed in consideration of such payment and promised Whittemore that he would not disclose to any person the point and would not permit himself to be retained in either of said cases by the city and county; that he performed no professional or other services for this payment, and that it was not expected that he should; that at the time of the said agreement and said payment both Cowdery and Whittemore believed that said point if presented to this court would result in reversing the judgments above mentioned; that by reason of the foregoing, Cowdery has violated his oath as attorney and counselor at law, and the duties imposed on him, and should be removed from his office as attorney and counselor.

In his answer Cowdery denies the following averments: That he ever told Whittemore that there was a point in either of the cases above mentioned which would be fatal.

if presented to the Supreme Court; that Whittemore, in consideration that respondent would not disclose such or any point to his successor in office, and would not be retained by the city and county to represent it in either of said cases, paid to him one hundred dollars; that in consideration of the payment of this sum of money, he promised Whittemore or any other person that he would not disclose to any person any point in the cases or either of them; that at the time of the agreement between him and Whittemore, he, Cowdery, believed that the point alluded to would result in reversing the judgment in each or either of these causes.

On the issues joined the cause came on for trial in this court.

The statute of this state provides that "every person on his admission [as attorney and counselor at law] must take an oath to support the constitution of the United States and the constitution of the state of California, and to faithfully discharge the duties of an attorney and counselor at law to the best of his knowledge and ability." (Code Civ. Proc., sec. 278.)

It is provided in section 282, Code of Civil Procedure, *inter alia*, that is the duty of an attorney and counselor at law,—

"1. To support the constitution and laws of the United States and of this-state.

.    .    .

"5. To maintain inviolate the confidence, and at every peril to himself to preserve the secrets of his client."

In section 287, Code of Civil Procedure, it is provided that,—

"An attorney or counselor may be removed or suspended by the Supreme Court, or any department thereof, or by any Superior Court of the state, for either of the following causes, arising after his admission to practice:

..    .    .    .    ..    .

"2. . . . Any violation of the oath taken by him, or of his duties as such attorney and counselor."

The duties of an attorney and counselor at law spring from his obligations, and those obligations are defined and limited by law. One of the principal obligations which bind him is that of fidelity under all circumstances to his client, the maintaining inviolate the confidence reposed in him by those who employ him, and at every peril to himself to preserve the secrets of his client. (Code Civ. Proc., sec. 282.)   This obligation is a very high and stringent one. If it is ever relaxed it is under exceptional circumstances, which rarely occur. If relaxed without the consent of the client, it is of most infrequent occurrence. The public is interested in the strict maintenance of this obligation, for without it there can be no assurance that the duties which devolve upon such officials as ministers of justice will be properly discharged. It is essential to the administration of justice and of the respect which the tribunals for its administration should command, that these officers should discharge with the highest fidelity, and with the utmost good faith, the responsible duties which devolve on them.

The following facts are, in our opinion, established in the cause:—

The respondent, in December, 1881, entered upon the discharge of his duties as attorney and counselor for the city and county of San Francisco, having been elected to that position at an election held a short time before. He continued to be such attorney until the first Monday in January, 1883 (5th of that month), when his term expired. When he went into office there were a large number of cases pending (some eight hundred), in which the city and county was a party, involving street work, and which were in his office; that he was unable to make himself acquainted with the merits of all these cases during his one year's incumbency; that he was not acquainted with the two cases whose titles are given above. These two cases were pending when respondent took office. They had been tried in the court below, and judg-

ments had been rendered against the city, and motions for new trials had been made and denied. That he knew nothing of the facts or law points involved in them, but determined to appeal them, as a matter of official care and caution, and directed his assistants to appeal all cases to this court which were in a condition to be appealed. That the two cases aforementioned were with others so appealed, and the transcripts brought up to this court. That in December, 1882, D. H. Whittemore called on him, and asked him to stipulate to advance these causes on the calendar of this court. That he refused to stipulate, saying that he did not wish to hamper his successor, who would in a few days come into office. That he never knew at any time anything of the testimony or of the questions of law or fact involved in the cases, and had never read the transcript, and knew nothing of the testimony in either of these cases. That in a report sent to the board of supervisors, and signed by him as such attorney and counselor, these cases were mentioned as pending in the Supreme Court, but though this report was signed by him, he had never read it and did not know its contents. On or about the twelfth day of April, 1883, he met Whittemore on Montgomery Street, in the city of San Francisco, and had a conversation with him. The Supreme Court on the 10th of April, 1883, affirmed the judgments in the Bonnet and Parker cases above mentioned. Respondent was aware of this when he had the conversation with Whittemore on the 12th of the same month. He said to Whittemore: "Hallo! You have won your Parker case. Now you have won your case, how are you going to get your money? Does not the Brickwedel decision cut you off?" He said he would see about getting his money, and I said: "Whittemore, did they raise the point on you that I raised in the Blum and Lieu case, that there was not sufficient allegation of presentation of claim to the board of supervisors before suit." He said: "No; there is nothing in that point anyway.

The Supreme Court has decided it twice in the Gurney and Parker cases, and I care nothing about it. If there is, there could only be a delay for a new trial; it is nothing on the merits. As a matter of fact, the complaint alleged presentation and rejection by the supervisors, and the court had found in both cases that the claims had been presented and rejected." After some remarks about one Sam Davis buying the judgments, he (Whittemore) said to him: "Are you in a position to accept a fee in this case?" to which respondent replied: "Yes; I have had nothing to do with the cases and know nothing about them, and had not been employed by the city, and I thought I was in a condition to accept a fee." Respondent said at the same time: "Mr. Whittemore, I can do nothing against the city in this case and I do not want, for appearance' sake, to be consulted in them." He (Whittemore) said he did not want him to do anything in the case. All that he wanted was that he should not be employed against him. Respondent said: "All right. The city had not attempted to employ me, and she had got other counsel, and that I would accept $100." On the same day or the next this money was sent by Whittemore to respondent. After this employment Cowdery had nothing further to do with the cases. He offered to give any information to his successor, Craig, about any cases in his office. Isaac N. Thorne had the management of these and other street cases as an assistant to Cowdery, and Thorne was directed to give all information about these and all other cases in the office to Craig. It does not appear that any information was ever given to Craig by either of them in relation to the Bonnet and Parker cases. Respondent was a salaried officer of the city and county, and received all the salary due him. He was furnished with assistants who were also paid salaries during their employment as assistants.

It is contended that Cowdery violated his duty as attorney and counselor in accepting this employment from

Whittemore in the Bonnet and Parker cases, after having had control of them as the attorney and counselor for the city; that having been the attorney and counsel of said city while the causes were pending, he could not accept any employment in regard to them which would put him in a position hostile to his former client; on the other hand the contention is, that Cowdery having acquired no knowledge of the facts, and received no confidential communications from his client in the cases after the expiration of his term of office, he was at liberty to be employed by the adverse party.

The questions arising on these contentions have been elaborately argued, and are before us for decision.

The case of *Cholmondeley* v. *Clinton*, 19 Ves. 261, S. C., Coop. 80, is cited on behalf of respondent. In this case a motion was made by defendant for an injunction restraining the plaintiff, Earl Cholmondeley, from employing William Montriou as his solicitor in the action above entitled, or as his attorney or solicitor in any other suit in equity or action at law, commenced or to be commenced by Earl Cholmondeley against Lord Clinton, in respect of any estates or property, the title whereof came to the knowledge of Montriou as clerk of William Seymour, one of the defendants, while he was the attorney and solicitor of the defendant, Lord Clinton, or which came to the knowledge of Montriou as solicitor for Lord Clinton, while in partnership with Seymour, or with Seymour and Squibb; and also restraining Montriou from acting as solicitor or attorney for plaintiff in any suits or actions, and from communicating to the plaintiff, his counsel, solicitors, attorneys, or agents, any information relating to the matters in dispute in such suits or actions which has come to the knowledge of Montriou as clerk to Seymour, or as solicitor to Lord Clinton as above mentioned.

It appeared that Montriou had been clerk with Seymour and afterward his partner. Subsequently Squibb

was taken into the partnership. During the period that Montriou was clerk for Seymour, the latter was solicitor for Lord Clinton. While the partnerships existed, he and Seymour and subsequently he and Seymour and Squibb were solicitors for Lord Clinton.

In 1812, during the period above mentioned, the bill in this suit was filed to recover considerable estates of Lord Clinton in the counties of Devon and Cornwall, claimed by the plaintiff; and Montriou, while clerk and partner with Seymour, became intimately acquainted with the affairs and property of Lord Clinton and the titles of the estates, the subject of the suit, preparing abstracts, deeds, etc., relating to them, and Seymour conferred with him upon the title and the defense. The answer was prepared in 1812. The partnership was dissolved some time in 1813, as to Montriou, who in December, 1814, communicated his appointment to be solicitor to the plaintiff, Earl Cholmondeley, for conducting his suits against Lord Clinton.

It was stated in the affidavits of Seymour and Squibb and two of their clerks, that Montriou, as such clerk and partner, acquired such information touching the titles, estates, and affairs of Lord Clinton and his defense, etc., as would, in the judgment and belief of affiants, render his being concerned in the management of the suit as solicitor for the plaintiff highly prejudicial and injurious to Lord Clinton, and they could point out particulars did they not believe that they should thereby produce great part of the mischief which the application for an injunction was intended to avert.

Montriou's affidavit stated that he was never consulted confidentially by Lord Clinton, while Seymour was, that Seymour had the whole management and control of the case, all letters were confidential and addressed to him, and all deeds, papers, etc., relating to the estates were collected by Seymour in 1812, and secured in his private office. He admitted his acquaintance with some of Lord

Clinton's affairs. When he was clerk he revised an old abstract relating to the estates in question, but did not recollect that he prepared any deeds, etc., or that Seymour conferred with him on the title, further than by informing him of plaintiff's claim and the objection on which it was founded; admitted that he was well acquainted with the abstract of defendant's title, which does not contain any deed or statement not appearing on the pleadings,—that the application to become plaintiff's solicitor came from plaintiff's agent. He denied that he possessed any information acquired as clerk or partner that would in his judgment or belief render his being concerned for plaintiff highly prejudicial to the defendant, and stated that the treaty for the dissolution of partnership commenced and was concluded very soon after Lord Clinton appeared to the bill in November, 1812. It was admitted that one stipulation in the articles of dissolution was that Montriou should not act as solicitor for Lord Clinton.

In deciding the case, the Lord Chancellor discussed many points regarding the relation of attorney and client, and closed his opinion as follows, as reported in 19 Vesey :—

"Upon many of the grounds that have been agitated, I shall not give any judgment. I shall decide this case upon the dry question whether this plaintiff has a legal right to employ Mr. Montriou, and whether he has a legal right to accept that employment. With regard to the propriety or delicacy of conduct, I do not sit in this place to communicate my opinion upon such subjects; and therefore shall follow the example of Lord Thurlow, who upon a question as to the interest of a debt, which a noble lord, then sitting by him, admitted he ought to pay, said he should decide only on the legal right; desiring that the arguments of propriety and delicacy, submitted to him as Lord Chancellor for his legal judgment, should be addressed to that noble lord himself.

So I shall refer the arguments addressed to me upon those motives of propriety and delicacy to the plaintiff and Mr. Montriou, and shall consider only the dry question whether the attorney of the plaintiff, being removed, not by the discharge of the plaintiff, can, in that very cause in which he had been employed by him, become the attorney for the defendant. That depends upon a principle applying to cases both in this court and at law; upon which I shall soon have an opportunity of consulting the judges; and will then give my opinion on that question of law; again disavowing a right to give my opinion upon any other view of this case."

"The Lord Chancellor [on a subsequent day] declared the unanimous opinion of all the judges and the Barons of the Exchequer, the Master of the Rolls and the Vice-Chancellor, agreeing with his lordship's, that an attorney or solicitor is not at liberty to act in the manner proposed by Mr. Montriou; and that having thus left the cause, he is not in the situation of a solicitor discharged by the client, and therefore cannot become the solicitor for the other party in the same cause." (19 Ves. 275, 276.)

The report in Cooper, 80, is substantially the same, but in stating the result of his consultation with the law judges he used this language:—

" His lordship this day stated that he had requested the Chief Justices of the courts of King's Bench and Common Pleas and the Chief Baron of the Exchequer to inform him of the opinions of their respective courts upon the above point; that he had been informed by Lord Ellenborough and Lord Chief Justice Gibbs that the opinions of their two courts were that an attorney could not be allowed so to act; that he had also spoken to the Master of the Rolls and the Vice-Chancellor, and that they concurred in the opinion; but he had not yet been able to learn the opinion of the court of Exchequer, which, however, he would communicate as soon as he received it."

February 3, 1815: "This morning the Lord Chancellor informed the counsel in this cause that since the subject was last mentioned he had received from the Lord Chief Baron of the court of Exchequer the opinion of that court, which was that no solicitor who had been employed as such on one side could afterwards be employed on the other. His lordship stated that the opinion of all the courts and judges he had communicated with, also, was that Montriou did not stand in the situation of a discharged solicitor. He added that he should say no more in judgment upon the motion, as Montriou had been advised by counsel that he might become the solicitor of the plaintiffs in the cause, and had acted upon that advice, believing it to be right." (Coop. 88, 89.)

In this case, Lord Eldon decided and intended to decide but two points: 1. That a solicitor who had been employed as such on one side of a cause could not afterwards, having voluntarily quit the cause, be employed on the other; 2. That Montriou did not stand in the situation of a discharged solicitor.

In *Robinson et al.* v. *Mullett et al.*, 4 Price, 353, a solicitor had acted, to a certain extent only, for parties defendants in an amicable suit in chancery, to procure the opinion of the court upon the construction of a will. In that cause one of the defendants in this case was plaintiff, and the plaintiffs in this case with others (residuary legatees and executors) were defendants. All the defendants in the chancery suit employed the same solicitors to put in their answers. In consequence of disputes afterwards arising between the parties, the plaintiffs in this suit filed their bill against the executors and other parties, to have the trusts of the will executed, and for an injunction and receiver, and employed the solicitors who had been employed by themselves, the executors and the other parties in the suit in chancery to prosecute the suit. An application was made to restrain the solicitors from acting for plaintiffs in this suit, etc. It

appeared from the deposition of the solicitors sought to be restrained that they were not in possession of any secrets of defendants, or any information whereby their interest could in the slightest degree be prejudiced; that all communications made by defendants to them had been made in the presence of plaintiffs or subsequently related to them by defendants.

"The court held that the employment of these solicitors for the present plaintiffs by such of the defendants as they had acted for in that suit, and to such an extent only, was too slight a ground for the application to restrain them from acting in this cause, as there did not appear to have been any important confidential matters disclosed to them, the knowledge of which might be used in prejudice of the party so applying." The court discharged that part of the order only. The order which had been obtained on the part of the executors, restraining these solicitors from acting as attorneys or solicitors in any other suit in law or equity between the parties, was allowed to stand.

In this case, it will be observed the former suit was amicable, one to procure the construction of a will, the solicitors had been engaged for all the defendants, that no important confidential communications were made to them, and that all communications made to the solicitors were made in the presence of the plaintiffs, or subsequently stated to them by the solicitors. The restricted relief granted will also be observed, and an important part of the order of the court was not set aside by the court.

In *Bricheno* v. *Thorp*, Jacob, 200, Lord Eldon refused to restrain one Day, who had been clerk for the solicitor of the plaintiffs (himself one of the plaintiffs), when the action was commenced, from acting as solicitor of defendants, on the ground that it did not appear that he had become possessed of any information while he was clerk which could be prejudicial to the plaintiffs. The

court said that the general allegation that he had become possessed of such information, without pointing out the particular information acquired, was not sufficient. But in deciding the cause the court said: " There may be cases where the mischief, which the case of *Cholmondeley* v. *Clinton* was intended to counteract, may equally occur in the case of a clerk. On the other hand, the case may be of such a nature that, though the clerk may be retained for the opposite party, it may be impossible for any information he possesses to do any mischief.

"But if he is to carry important secrets out of the office, and employ them in the service of others, though I feel that it may operate to the detriment of young gentlemen setting up in business, yet I think that ought not to be permitted. I ought therefore to be informed of the nature of the suit, and wish to see the bill and answer. A gentleman going into business for himself must not carry into it the secrets of his master; but on the other hand, I think it my duty to take care that he may not be prevented from engaging in any business that he may fairly and honorably take." (Jacob, 301, 302.)

It should be observed that this was the case of a clerk afterward setting up in business as a solicitor. The Lord Chancellor remarks on this circumstance, as distinguishing the case from *Cholmondeley* v. *Clinton, supra.* If it had appeared that he had acquired any information which might be prejudicial to the plaintiffs, the court would have restrained him. In this case, Lord Eldon required that the particulars of the information acquired by Day, as clerk, should be pointed out to him, not publicly, on the papers. This was not done, and therefore he refused the order.

In *Beer* v. *Ward*, Jacob, 77, the same court refused to restrain a solicitor from giving evidence of confidential matters in another court, on the ground that the question should be left to the court before which he might appear

as a witness (pp. 79, 80). As to restraining a solicitor from making communications of confidential matters to individuals, the court said:—

"You must show me what has been done; for I could not interfere to restrain in this case any more than in cases of waste, unless something has been done which ought not to have been done." For lack of such showing the restraint as to making communications to individuals was refused.

In *Davies* v. *Clough,* 8 Sim. 262, Jones had been employed as solicitor for Mrs. Clough in the negotiation of an agreement by virtue of which £3,160 was paid to her. Disputes afterwards arose between Jones and his client. as to his bill of costs, which she procured to be taxed, and it was reduced. Jones afterwards filed a bill against Mrs. Clough as solicitor for other parties to set aside this agreement. The court restrained him from so acting, and also from communicating any information relating to the agreement that had come to his knowledge confidentially as solicitor for his former client.

In *Grissell* v. *Peto,* 9 Bing. 1, the court refused to restrain attorneys from acting in a cause for defendant, on the ground that they had obtained a knowledge of the plaintiff's case in the course of a chancery suit, in which they had been acting in conjunction with plaintiff, and in which defendant had no interest, but in which they had acted for the defendant. The attorneys deposed that they obtained little more information than would have been furnished by plaintiff's bill of particulars. Two of the judges remarked that a case of this sort might occur in which the court would think it right to interfere.

Let it be observed here that the information in this case was obtained, not in the case before the court, but in another suit in another court. Yet under such circumstances two of the learned justices intimate that a case might occur in which it would be right for the court to restrain.

*Johnson et al.* v. *Marriott,* 4 Tyrw. 78, S. C., 2 Cromp. &
M. 183, 2 Dowl. Pr. 343, is also cited. The reports agree
as to the point on which the motion was decided.

The point for decision arose on a rule *nisi,* calling on
defendant to show cause why an order of Bayley, B., ap-
pointing Cyrus Jay attorney for defendant, should not be
set aside and Jay be restrained from acting as attorney
for the defendant in the cause above named. In the
report in Tyrwhitt it is stated "from affidavits of the
present attorney for the plaintiff and his clerk, it appeared
that in May, 1832, Jay had been appointed attorney to
the plaintiffs as assignees of Cochrane, and as their attor-
ney had commenced this action in their names, to recover
goods of the bankrupt which had been taken in execu-
tion. His bill of costs showed that he had delivered the
issue, made two copies of the pleadings for briefs, had
conferences with the bankrupt, given notice of trial, and
taken the opinion of counsel on all the facts of the case.
Afterwards and before the trial he was discharged by the
plaintiffs, who now swore to their belief that he was
fully acquainted with all the circumstances of their case,
and that the defendant's employing him would injure
the plaintiffs."

Three of the judges gave opinions. Bayley, B., rested
his judgment on the circumstance that the clients, the
assignees (plaintiffs in the case), made no affidavit. He
said: "But the chief foundation of my opinion here
is, that the clients, the assignees, make no affidavit. The
attorney here having been in the first instance concerned
for them, they know and can best tell whether they made
confidential communications or not to Jay, which it
would be material that he should not disclose to the de-
fendant. But no such matter is sworn to by either of
them or their solicitor. It has been argued that the case
drawn and submitted to counsel for his opinion must
have conveyed such information to Mr. Jay; if that were
so, the affidavits should have stated that it did contain

facts necessary to be kept from the defendant's knowl-
edge, in order to prevent injury from accruing to the
plaintiffs by the disclosure.  If the assignees had sworn
that they had made communications to Mr. Jay of that
essential importance, that if disclosed to the defendant,
they, as plaintiffs, would be materially prejudiced in their
suit, I should have hesitated to discharge this rule, and
to suffer Mr. Jay to act for the defendant; but as no
assignee or creditor states that a single material fact was
communicated to Jay, and the application is rested solely
on the affidavits of the plaintiffs' present attorney and
his clerk, whose conclusions of the amount of Mr. Jay's
knowledge of the facts are drawn from his bill of costs,
I am of opinion that no sufficient case is established
upon which the court can make this rule absolute."
(*Johnson* v. *Marriott*, 4 Tyrw. 82, 83.)

Bolland, B., said: "I agree with my brother Bayley, and
for the same reasons.  We are here to decide on the rights
of three parties, viz., of the defendant who seeks to employ
Mr. Jay as his attorney, of Mr. Jay whose interest is con-
cerned in that employment, and of the plaintiffs who wish
to restrain the defendant from having Mr. Jay's services on
this particular occasion.  Now the affidavits disclose no
facts sufficiently strong to warrant us in exercising our
power to restrain him from acting as attorney to the de-
fendant.  The only fact on which his so acting is objected
to by the plaintiffs is, that he has been before employed
by them in this case and afterwards discharged by them,
but without any imputation of misconduct.  Now in
*Cholmondeley* v. *Clinton*, Lord Eldon, after consulting all
the common-law and equity judges, seems to have been
of opinion that a solicitor discharged by his client for
any reason other than misconduct is differently situated
from a solicitor, who has withdrawn voluntarily from
the cause in which he had been employed, and that he
was therefore clearly at liberty to employ his talents and
exertions for the opposite party; though if he afterwards

communicated to the latter the secrets of his former client, or in his new employment improperly used that knowledge of them with which he had been confidentially intrusted by his original client, so as to injure or prejudice him, the court might interfere to punish him for so doing.   But no facts are here disclosed to warrant the interference prayed for by this rule." (*Johnson* v. *Marriott*, 4 Tyrw. 82, 83.)

Gurney, B., said: "I concur, but I do not say that if an attorney conducted himself so as to procure his client to discharge him, a court would not restrain him from acting for the opposite party, and consider his discharge to have been in truth his own act; but in the present case the plaintiffs have not shown in their affidavits that Mr. Jay was acquainted with any confidential communication made by them, the acting on which by Mr. Jay for the defendant, or the disclosure of it by him to the defendant, might prejudice them in the action." (*Johnson* v. *Marriott*, 4 Tyrw. 82, 83.)

The case manifestly was ruled as it was for want of evidence.   It was assumed that it was incumbent on plaintiffs to show that the attorney, Jay, had received confidential information from them, which it would be to their prejudice that Jay should disclose or use.   Bayley, B., said that this must appear by the affidavits made by the clients.   Bolland, B., agreed with Bayley, B., "*and for the same reasons.*"

Nothing was assumed or presumed as to Jay's acquiring any knowledge of the case from the fact that Jay was employed by the plaintiffs in the cause, and that his bill of costs showed that he had delivered the issue, made two copies of the pleadings, given notice of trial, and had taken the opinion of counsel on all the facts of the case. As to the case submitted to counsel for an opinion, Bayley, B., laid it out of consideration, because the affidavits did not state that the *case* contained facts necessary to be kept from defendant's knowledge, in order to prevent injury

from accruing to plaintiffs by the disclosure, and this though the affidavits of the then attorney and clerk stated that Jay had taken the opinion of counsel on *all the facts of the case.* The opinion seems to have been placed to some extent on *Bricheno* v. *Thorp*, which was a case where it was averred in a general way that the solicitor ought to be restrained because while clerk he had acquired knowledge of confidential matters which it would be injurious to the plaintiffs to be disclosed. This circumstance is relied on by Lord Eldon in his judgment, and for that reason he required the particular facts to be pointed out to him (not publicly) of which the solicitor had acquired knowledge while clerk, and this manifestly for the reason that a clerk does not always become possessed of the facts confidentially communicated by a client to his employer. This is otherwise of a solicitor or attorney with whom the client always confers. Bayley, B., and Bolland, B., both state that Lord Eldon, in *Cholmondeley* v. *Clinton*, seemed to be of opinion that if Montriou had been discharged by Lord Clinton, he could have been employed by the plaintiff. We do not think anything said in the opinion by Lord Eldon justifies such a conclusion. He expressly declined to decide the point,—merely mentioned it among the facts of the case, that Montriou did not occupy the position of a solicitor discharged by his client; and in *Bricheno* v. *Thorp*, in referring to the case of *Cholmondeley* v. *Clinton*, Lord Eldon said: "If Lord Clinton had discharged the gentleman, and would not continue to employ him, *on such a case no opinion was given.*" (Jacob, 303.) In the report of *Cholmondeley* v. *Clinton*, Coop. 88, he asks this question: But even if an attorney is discharged, can it be that his having been so discharged by one party shall be the very reason why the other party shall employ him?—but does not decide it. The points determined in the Cholmondeley case have been stated above, and are, we think, stated accurately.

We .do not see that *Jackson* v. *State*, 21 Tex. 668, has any application to this case. The portion of the opinion in that case referred to and quoted in the brief of counsel has only reference to the special verdict in the case and its insufficiencies.

The cases above cited do not hold that an attorney or solicitor, when discharged by his client, though he may be employed by his adversary, can make use of the secrets in relation to the cause obtained from his former client. On the contrary, we understand the cases to hold that a court would restrain an attorney or solicitor from such conduct, and if he could not be otherwise restrained, it would punish such betrayal of confidence by striking him from the roll. In *Johnson* v. *Marriott*, the court refused to act from lack of evidence. If the evidence had been sufficient, would not the defendant have been restrained? We are of opinion that the court in that case would have restrained him, even when he had been unjustly discharged, and he was allowed, as contended, to be employed by the adversary party.

  The law secures to the client the privilege of objecting at all times and forever to an attorney, solicitor, or counsel from disclosing information in a cause confidentially given while the relation exists. The client alone can release the attorney, solicitor, or counsel from this obligation. The latter cannot discharge himself from the duty imposed on him by law. ( *Wilson* v. *Rastall*, 4 Term Rep. 753; *Vaillant* v. *Dodermead*, 2 Atk. 524; *Sandford* v. *Remington*, 2 Ves. Jr. 189, note.) The cases cited on the other side are *Wilson* v. *State*, 16 Ind. 392; *Price* v. *Grand Rapids etc. R. R. Co.*, 18 Ind. 137; *Herrick* v. *Catley*, 1 Daly, 512; *White* v. *Haffaker*, 27 Ill. 349; *Gaulden* v. *State*, 11 Ga. 47; *Valentine* v. *Stewart*, 15 Cal. 387–401; *People* v. *Spencer*, 61 Cal. 128.)

In the Indiana cases, the attorney became acquainted with the facts of the case while acting as such, and it was held that he should not be allowed to change sides, and

after having acted for one party in a suit, to act for his adversary.   In both cases, the judgment was reversed on the ground above indicated.   One of these cases was a civil action; the other criminal.   In the case in 16 Indiana, the · defendant objected to the attorney's (Mr. Flagg) assisting in the prosecution of the case, and filed his affidavit, stating in substance that "he had employed Flagg to defend him against said charge, executed to him his notes for two hundred and fifty dollars, and disclosed to him the facts in the case and the evidence for his defense"; that after the return of the indictment, Flagg had informed him that he would not act further as his attorney, and had delivered up his notes.

Flagg stated by affidavit that he had been desired by defendant to act as his counsel, who stated to affiant that the prosecuting witness and her husband did not desire his services, and on that ground he consented to act; but having subsequently learned that said persons had desired and did then desire his services, and had sent word to him to that effect, he declined to act for defendant, "and returned to him the notes he had received from him for services; that he has received no compensation from defendant, and has not, to his knowledge, learned anything from defendant as to his grounds or means of defense."

The objection of defendant was overruled, and Flagg was permitted to assist and did assist in the prosecution.

The Supreme Court observed as follows:—

"In searching for the reason upon which a conclusion rests, we are often led to consider the results which might flow from the maintenance of an adverse conclusion. For instance, in the case at bar, if the ruling of the court below, and the conduct of Mr. Flagg as an attorney and officer of that court, should be sanctioned as legal, we are constrained to believe that the positive tendency of such ruling would be to defeat the very purpose for which the court was organized, namely, the administration of jus-

tice; and if indulged and continued, in courts, and the officers thereof, will necessarily result in sapping the foundations of the temple of justice. With what confidence could one, arraigned upon a charge of crime, confer with his attorney, or reveal to him his evidence, and thereby prepare for his defense, if that officer is permitted, after thus acquiring such knowledge, to change their relative positions, and instead of standing up as his defender, to stand forth as his accuser? Would he not consider it better to stand mute, dumb, as the sheep before the shearer, rather than disclose the evidence which might thus be turned against him? He might, perhaps, truthfully believe it more to his interest to return to the practice of a semi-barbarous age, when the prisoner was not heard in his defense by counsel, or witnesses in his behalf, than thus to have the weapons of his defense turned against him, by those in whom, by the acknowledged law and the statute, he had a right to confide." (16 Ind. 395.)

In the case in 18 Indiana, the question is stated and decided as follows:—

"The next question is upon the refusal of the court to exclude James M. Flagg, Esq., from acting as attorney for the plaintiff in the suit, the one then pending being the second trial of the cause.

"This cause, as we have seen, was commenced in 1855, and was first tried below in 1856. It came to the Supreme Court, where the judgment below was reversed, and the cause remanded for another trial. The second trial, from which record the pending appeal was taken, was had in 1860. On the first trial, Mr. Flagg acted as attorney for the defendant, under the following circumstances:—

"Mr. Price, the defendant, had employed Mr. Ellison, to whom alone he was willing, it seems, to trust his cause; but other persons interested in the question employed Mr. Flagg to act as associate counsel with Mr. Ellison, for Mr. Price, in his defense. Mr. Price accepted the

services of Flagg upon these terms, treated him as his attorney, consulted with him fully upon his defense, and Mr. Flagg participated, on the trial, in the examination of the witnesses and the argument of the cause. Beyond doubt, in this state of facts, he is to be regarded as having been the attorney of Mr. Price, equally as though he had been feed by him. How he came to take a fee from the plaintiff, on the second trial, does not appear. And now the question arises, Can an attorney accept fees on both sides of the same cause?—for, though the trials were different, the cause was still the same.

"On this point there is but one opinion. Says Professor Sharswood in his Legal Ethics: ' The criminal and disgraceful offense of taking fees of two adversaries ought, like parricide in the Athenian law, to be passed over in silence in a code of professional ethics.' ' A pleader is suspendable when he is attainted to have received fees of two adversaries in one cause.' (Mirrour of Justices, c. 2, sec. 5.)

"Where an attorney has, in the course of other business or in conducting other suits, obtained a knowledge of matters connected with the suit in question, courts will not, in general, simply on the fact of such knowledge, restrain an attorney from acting against the party through whose business he obtained such knowledge, especially where such party does not desire his services. But he is never allowed to change sides in the same suit. (1 Monell's Pr. 182. See also *Wilson* v. *State*, 16 Ind. 192; *Henry* v. *Raiman*, 25 Pa. St. 354; S. C., 64 Am. Dec. 703.) And see 1 Selwyn's Nisi Prius, 7th Am. ed., p. 165, for a large collection of cases relative to attorneys at law." (18 Ind. 140, 141.)

In the case from 1 Daly it is held that an attorney cannot serve professionally both parties to a controversy, and where he has been retained by one he cannot recover for professional services rendered in the same matter to the other. The court made these remarks in the case:—

"While the relation of attorney and client continued between the plaintiff and the defendant's wife, he could not enter into an agreement to act also as the attorney of the husband in a matter so directly connected with the subject of his employment as that of effecting a reconciliation, and settling the matter in difficulty between them. He had been employed by the wife to procure a separation, and could not therefore engage to act for the husband as his attorney in preventing it. In other words, he could not act on both sides. An attorney, said Chief Justice Hobart, oweth to his client fidelity, secrecy, diligence, and skill, and cannot take a reward on the other side (*Yardly* v. *Ellill*, Hob. 8 a; Tomlins's Dict., tit. Attorney); and in *Shire* v. *King*, Yelv. 32, *King* v. *Shore*, Cro. Eliz. 914, it was held that he cannot deal upon both sides except as an arbitrator." (1 Daly, 514.)

In *White* v. *Haffaker*, 27 Ill. 349, it was held that a solicitor in a case cannot act as a special master to execute the decree. (See remarks of court as to relation of client and attorney on page 351, 27 Illinois.)

In *Gaulden* v. *State, supra*, it appeared that Gaulden, when solicitor-general of the district, had, at the April term, 1851, draughted the indictment against James Cody and Patrick Cody for misdemeanor, upon which the issue for trial was formed, that he consulted with the assistant counsel, and was cognizant of the facts of the case. The case came on for trial at the December term, 1851, when Gaulden appeared as one of the counsel for defendants, and requested his name to be marked upon the docket. It also appeared that the solicitor's fee for drawing the indictment had been allowed by the court, but had not been paid, because there was no fund on hand to pay it.

The counsel for the state objected to Gaulden's appearing as counsel for defendants, and the court excluded him. This was assigned for error.

The Supreme Court, in its opinion, remarked as follows:—

"The question made in this case is, whether a solicitor-general who, in his official capacity, has drawn an indictment against a defendant or defendants, and prosecuted the same as counsel for the state, can be permitted, after the expiration of his term of office, to take a fee from the defendant or defendants in such indictment, and appear as his or their counsel, for the purpose of defending him or them, on the trial, for the accusation contained therein. . . . . It is urged in behalf of the former solicitor-general that in his official capacity he must be considered as standing indifferent between the people of the state and the defendant who is indicted; that when his successor has been elected and qualified, the state is to be considered as having *discharged* him from her service, and therefore he is at liberty to appear as counsel for the defendants whom he prosecuted while in office. Admitting that in his *official* capacity he is supposed to stand indifferent so far as his personal feelings are concerned, yet he is not the less the counsel for the state on that account, and must necessarily become familiar with the facts of the case upon which the state relies for a successful prosecution of the indictment. His position as the counsel for the state enables him to learn the difficulties which may stand in the way of the conviction of one who is really guilty, which no other person would be as likely to know, for the reason that his communication with the prosecutor, the witnesses, and the grand jury, afford him the means of ascertaining many facts, which only those who are *officially* connected with the government can know. Should he be permitted to make use of the privilege thus officially conferred upon him, while in the discharge of his duties as counsel for the state, for the purpose of defending those who have been accused of crime during his official term of office, and that, too, for a reward paid by them to him, for such service?

"Neither can the solicitor-general, on the expiration of his term of office, properly be considered as having been *discharged* by the state. The contract between him and the state is, that he will perform certain duties enjoined by law, for a specified term of time, for a stipulated compensation. Upon the expiration of the period of time for which he was elected, he is out of office, by the *express terms of the contract.* The state does not discharge him, but his term of service expires by the express stipulation of the contract made between himself and the state; and hence, the want of any analogy between such a contract and a contract with a private citizen for professional services, who discharges his counsel from his case before the termination of the suit in which he is employed. The administration of the law should be free from all temptation and suspicion, so far as human agency is capable of accomplishing that object; and in our judgment, *public policy* most emphatically demands that a solicitor-general who has been employed by the state to prosecute defendants for a violation of her laws, for the compensation fixed by law, should not be allowed to defend such defendants from the charge contained in the indictment, after the expiration of his term of office, for a compensation to be paid by them for that purpose. Such a practice will have a tendency to greatly embarrass the administration of the criminal law; for, as the term of the office of solicitor-general is about to expire, prosecutors and others, who may be intrusted to prosecute offenders, will necessarily be restrained from communicating freely with the state's counsel, when he may be employed at the next term of the court, to defend the indicted culprit. It is no sufficient answer to say that the law will not allow him to disclose any fact which may have been communicated to him, as the counsel for the state, to her prejudice. If he *knows* the vulnerable points in the case, derived by his official connection with it, there are many ways by which those points might be

made available to the defendant, on his trial, by his counsel, besides disclosing them as a witness. If he has knowledge of facts, derived from his official connection with the prosecution, which will operate to the prejudice of the state, and he is permitted to act as counsel for the defendant, that knowledge will be made available in the defense; therefore we place our judgment on the ground that public policy forbids a solicitor-general, who has prosecuted a defendant for a violation of the law by preferring an indictment against him, should appear as his counsel to defend him from the charge, after the expiration of his term of office." (11 Ga. 49–51.)

The Supreme Court of Georgia affirmed the ruling of the court below.

*Valentine* v. *Stewart, supra,* was an action to enforce the specific execution of an agreement. The court below, on the trial, dismissed the action, on the ground that the agreement was in contravention of public policy and void, and this court affirmed its action.

The agreement was to withdraw certain depositions taken before the United States land commission, to settle private land claims in this state, taken to defeat a claim as fraudulent (see 15 Cal. 398–400); and an attorney, who the court held was in reality an attorney for the United States, was one of the parties so contracting. The court used this language :—

"He [speaking of the attorney] had, as counsel for the government, been put in possession of the case of the government; had taken testimony in the name and as agent of the government. The object and the intended effect of this testimony were to defeat the claim; he could not afterward, in consistency with the position, render any assistance to White and Stewart to maintain the claim. The obvious consequences of such a principle would be to encourage the intermeddling of attorneys in claims of this sort, and then having got full information and knowledge of the case, proceed to dispose of that

knowledge for their own profit to the other side. The true rule is, that an attorney, when acting for his client, is bound to the most scrupulous faith, *uberrima fides*. His own interests, for wise reasons, are not allowed to be brought in collision with the interests of his client. There can be no antagonism between these parties as to the matters of this delicate agency; the attorney is simply the representative of his client,—not his rival or competitor,—acting for the principal, not for himself. Very little knowledge of human nature is required to convince us that if the law allowed the attorney to deal with the principal as he might with a stranger, these responsible trusts, upon which the interests of society so much depend, would be turned into means of the grossest fraud and oppression. The law has therefore prescribed strict rules of restraint upon the action of the attorney, and will never permit him to take advantage of his position to speculate upon the interests which are intrusted to him. Even in the case of a purchase of the subject of the suit by the attorney, the client may set it aside at his pleasure, unless the attorney show by clear and conclusive proof that no advantage was taken, that everything was explained to the client, and that the price was fair and reasonable. But no case has come to our knowledge where an attorney has been permitted, after once acting as such in the prosecution of a suit, and having opportunities for knowing the facts of his client's case, to go over and render assistance to the adverse side, and enforce in a court of equity the contract based on such acts, or the agreement to do them." (15 Cal. 401, 402.)

In *People* v. *Spencer*, 61 Cal. 128, the proceeding was to suspend or disbar the respondent for acting on both sides in the case of one Harris. Spencer had drawn an indictment while district attorney against Harris, and afterwards appeared in the Superior Court of Lassen County as counsel for Harris, and moved to set aside the

indictment.   The court held that he must be suspended under the statute.   (Pen. Code, sec. 162.)   It said further: " But independent of statute, there can be no doubt that his conduct was reprehensible.   By appearing both for plaintiff and defendant in the same action, he was guilty of ' a violation of his duty as an attorney,' for which it is our duty to remove or suspend him.   (Code Civ. Proc., sec. 287.)"

Monell in his work on practice cites Ferguson's Irish Practice (a book to which we have not had access), and makes an extract from it (see 1 Monell's Pr. 182, 183) as to an attorney changing sides in the same cause.   Ferguson says (1 Ferguson's Ir. Pr. 37, 38): "Lest any temptation should exist to violate professional confidence, or to make any improper use of the information which an attorney has acquired confidentially, as well as upon principles of public policy, he will not be permitted to be concerned on one side of the proceedings, in which he was originally in a different interest, even though his former client makes no objection; and though discharged many years ago, and feeling himself free to swear that he has forgotten the nature and purport of the communications he had received from the former client, and that they were not confidential; for the court cannot investigate the plus or the minus of the confidence reposed in him without an absolute disclosure of the facts, nor can it calculate how much of these confidential communications are still in the recollection of the attorney; but the mere circumstance of a retainer sufficiently implies the fact of confidential disclosure, to whatever extent, having been made."

Monell cites, as to this extract from Ferguson, *Lessee of Flynn* v. *Marshall*, 1 Ir. Law Rep., O. S., 59; *Hutchins* v. *Hutchins*, 1 Hogan, 315; *Keon* v. *Nesbitt*, 1 Sausse & S. 365, note; *Waller* v. *Fowler*, 3 Id. 369.

It should be remarked in regard to the cases cited from the English reports that they all relate to attorneys

or solicitors, not to counselors or barristers. In this state, a person is admitted to the bar as both attorney and counselor, as the respondent here was, and this case is to be looked at in both aspects.

It should be remembered that in England an attorney can only recover his bill of costs and necessary disbursements. A barrister has no action to recover compensation for his services. The attorney cannot recover damages for a breach of contract. With us it is otherwise. Both the attorney and counselor can with us maintain an action for a breach of his contract of employment, and recover compensation therefor in damages. So when an attorney or counselor is unjustly discharged from a case, he can in this state recover compensation for any damage he may sustain by reason of such discharge. Owing to this difference of right, the law may be ruled in England in accordance with the contention of respondent.

Further, the respondent cannot be regarded as an attorney and counselor discharged by his client, the city and county of San Francisco. He was elected for a particular period of time or term, and when his term of office expired he was in no sense discharged. He took the term voluntarily, and by operation of law his employment ceased when his term ended. There is no analogy between the respondent's case and that of a private person discharging his attorney or counsel from a cause while it was pending. On this point, the remarks of the Supreme Court of Georgia in *Gaulden* v. *State*, 11 Ga. 50, above cited, are applicable, and we concur with what is there said on this point. But though his employment ceased, his obligation of fidelity still continued, and nothing appears to have occurred which discharged him from this obligation. Indeed, we much doubt whether the city and county had power to discharge him. Is there any law authorizing it?

This question, however, does not arise here, and we do not intend to decide it.

The respondent accepted a fee in the two cases above referred to *to sit out or stand out,* and did nothing at all in such cases.   He bargained for and received a fee of one hundred dollars for so doing.   He had previously received of the city a fee in such cases in the shape of his salary which was paid him.

Conceding that an attorney and counselor at law may be retained not to act or advise professionally adversely to the person so retaining him, can this be the case where he had been previously employed or retained and paid in the same cause by the adverse party ?   We think not.   The case cited, *McQuesney* v. *Heister,* 33 Pa. St. 444, does not go so far.   No case has been cited, nor have we been able to find one, where a counselor at law, who has been employed and received a fee from one party, has been afterward allowed to change sides and accept a retainer from his adversary in the same cause.   (See Sharswood's Legal Ethics, 5th ed., 117, 118.)

Some remarks were made by Lord Eldon in *Cholmondeley* v. *Clinton* which are pertinent just here.   " I recollect," he said, " many instances, both as to counsel and attorneys, in which it was extremely difficult for a man to say he should have been employed in both causes; and with regard to that, *Quod dubitas ne feceris* is a good rule for the regulation of your own conduct; but I do not recollect an instance of a solicitor changing his situation from the defendant to the plaintiff.   The case might easily be put that a most honest man, so changing his situation, might communicate a fact, appearing to him to have no connection with the case; and yet the whole title of his former client might depend on it." (19 Ves. 266, 267.)

Further, he said: "The naked question is, whether a person, having been for a considerable time employed in a cause for the plaintiff, can, after discharging himself, as I must take Mr. Montriou to have done, from the relation of attorney for the plaintiff in that cause, become

attorney for the defendant. The answer to the novelty of the application is, that the question must be considered open, unless in memory or tradition any instance can be shown of such a fact having actually occurred. I do not recollect, either in my own experience or from information in the memory of any one, any such instance. The practice of the bar in my time was this: If a retainer was sent by a party against whom the counsel had been employed, the retainer being in a cause between the same parties, the counsel, before accepting it, sent to his former client, stating the circumstance, and giving him the option. That has, I believe, been relaxed; and the course now is as it has been represented at the bar. I do not admit that he is bound to accept the new brief. My opinion is, that he ought not, if he knows anything that may be prejudicial to the former client, to accept the new brief, though that client refused to retain him." (19 Ves. 274, 275.)

These opinions of Lord Eldon go very far, and lay down a very strict rule as to the duties and obligations of attorneys and counsel. It is not based merely on *sentiment*, but on the rules of duty governing the relation as fixed by law. It will be observed that the Lord Chancellor is speaking of counsel as well as attorneys.

The Lord Chancellor refers in the above remarks to the course as represented at the bar. In the argument against the motion it was said: "If a counsel having advised upon pleadings and evidence, not being retained, the next day receives a retainer on the other side, which he is not only entitled but as a servant of the public bound to receive, there is no practice requiring notice to be given of that. This applies equally to the other branch of the profession." (19 Ves. 268.)

In reply to this, Sir Samuel Romilly for the motion said: "I do not understand the rule as to counsel to be as it is represented. I concur that a counsel consulted confidentially cannot counsel on the opposite side with-

out giving notice.  Great laxity, I admit, prevails as to
retainers; a difficulty, when it occurs, is usually referred
to some other counsel; and the consequence is, that
there is no general rule."  (19 Ves. 269.)  The counsel
further stated, "it is admitted, a counsel cannot reject a
retainer, and accept one from the opponent."  (19 Ves.
271.)

And in this view, as to a solicitor, Lord Eldon con-
curred.  In Cooper, 89, he said: *"I consider the question
to be nakedly, whether a person having been long officiating
in a cause as the solicitor,* and afterwards discharging him-
self, as I must take it that Montriou did in this case, by
the dissolution of partnership, can afterwards become
the attorney on the other side in the cause."  (Coop.
87.)  *This question he decided,* and held against Montriou.
(See his observations on page 89.)

As we understand the case, the ruling was not on the
ground that Montriou personally knew the facts com-
municated by Lord Clinton, but his partner knew them,
and under such circumstances Montriou was restrained
from using it as solicitor for Earl Cholmondeley.

In this case, the respondent agreed to sit out or stand
out, and not argue the causes in the Supreme Court.  He
was thus to refrain from exercising the functions of
counselor or barrister.  He was to do this in cases where
he had been employed and paid to act for a former
client.  He was not discharged by such former client.
By the agreement he entered into, he could not be
employed by his former client.  It was a violation of
his duty of fidelity to his client as attorney and counsel
to be employed and paid under such circumstances.  We
are of opinion that the rule laid down in Spencer's case
is correct, and should be enforced.  It is the better rule,
and one calculated to insure purity in the administration
of justice, and command the confidence of the public in
its administration.  (See 1 Monell's Pr. 182, 183.)

It should be remembered that the respondent filled a

public office, and the highest obligation of fidelity to the public rested on him. A proper public policy dictates that one employed by the choice of the people for a stated period, in the capacity of attorney and counsel for the state, or any portion of it, should not be allowed to say that he had received no confidential communications in his official capacity, and therefore that he was at liberty to be retained by the adversary in the same cause after his term of office had expired. It would be placing before gentlemen of the bar a temptation to neglect their duties when called to such public employment, which no principle of law justifies. A just public policy forbids it. A trustee for sale is not allowed to be a purchaser at his own sale, and *e converso*, on like grounds. (See *Michoud* v. *Girod*, 4 How. 554, 555.) A great jurist, Lord Lyndhurst, has said that the rule as to a trustee dealing with his *cestui que trust* had its origin in considerations of public policy, also as to transactions between attorneys and their clients. (See *Egerton* v. *Browalew*, 4 H. L. Cas. 160, 161.) These considerations of public policy apply here. (See remarks of court in the case above cited from 11 Georgia.)

Let it be observed that the respondent knew that the cases above named were pending and undecided. Whittemore had spoken to him in regard to them before the expiry of his official term. It is immaterial that he did not know all the evidence in the causes. He might have ascertained all the facts by inquiry. That he failed to inquire as to the facts can make no difference. The record was open to him. His abstention from knowledge of the facts, then, is immaterial. In a case where a counselor at law has argued a cause for his client in an appellate court, and where he has obtained his knowedge of the facts from the record alone, would it be permitted that in case of reversal of the judgment that he should change sides and conduct the cause in the court below for the adversary of his former client? Or where the

same cause comes again to the court of appeal, that he could appear for the party opposed to that one for whom he had formerly appeared and spoken? Certainly he could not be permitted so to act. What confidence would be reposed in the administration of the law if such conduct would be allowed? With what safety could a client act in retaining an attorney and counselor? Mr. Weeks, in his book on Attorneys at Law, says an attorney may be stricken from the rolls for acting in an action or suit on both sides. (Weeks on Attorneys at Law, sec. 81, p. 152, citing *Masais' Case*, 1 Keen, 74, and *Berry* v. *Jenkins*, 3 Bing. 423.)

The measure of punishment is a difficult question. But it should be remembered that at the time Mr. Cowdery accepted this employment, Spencer's case had been decided, on September 21, 1882, by this court, and it should also be remembered that at the time Cowdery was employed by Whittemore, he said to the latter, as quoted above: "I can do nothing against the city in this case, and I do not want, for appearance' sake, to be consulted in them,"—thus showing that the respondent had doubts as to the propriety of his conduct.

On a consideration of the whole case, we are of opinion that the respondent should be suspended from acting as attorney and counselor at law in any matter for the period of six months from the entry of the order herein.

The following order will be entered:—

In this cause, after hearing the evidence and considering the same, together with the pleadings herein, it is ordered that the respondent, J. F. Cowdery, be suspended from acting as attorney and counselor at law in any court in this state for the period of six months from this date.

McKINSTRY, J., McKEE, J., and Ross, J., concurred.

Mr. Justice Sharpstein was not present at the hearing.

Myrick, J., dissenting.—Mr. Cowdery, after the expiration of his term of office, owed duties to the city and county as follows: to impart to his successor, on request, whatever information he possessed in regard to the cases; and not to impart to opposing counsel information detrimental to the interests of the city.   He did not violate his duty in either of these respects.   There is no evidence that he declined to give to his successor in office any information, or that the city and county desired his services.   He accepted a retainer not to appear in the cases as attorney for the city and county.   He was not in duty bound to accept a retainer from the city and county.   However, it was unwise for him to accept the retainer from the opposing counsel, for two reasons: 1. By so doing, he subjected himself to a kind of criticism which no attorney should willingly subject himself to; 2. He received a fee with the understanding that he was to render no services therefor.   If immediately upon his attention being called to the doubtful propriety of his acceptance of the money he had at once returned it, he would have saved himself and the Bar Association much unpleasant feeling.   In regard to criminal prosecutions, the legislature has by law forbidden an attorney who has prosecuted an action from taking any part in the defense, and has declared that by such act he should forfeit his license to practice law.   The wisdom of applying the same rule to civil cases may be for the consideration of the legislature; as may also be the question whether attorneys should accept retainers without expectation of being actively employed.

In view of the whole case, as no harm occurred to the city and county, and none was attempted, I think suspension or revocation of the license a severity not called for.

Mr. Whittemore's position is in substance as follows: After the expiration of Mr. Cowdery's term of office, he asked the latter if he was free to accept a retainer not to appear in the cases against him (Whittemore), and was

informed that he was; and thereupon the fee was paid. I think whatever responsibility there was in the transaction, and the decision as to its propriety, was with Mr. Cowdery. Mr. Whittemore did not ask Mr. Cowdery to violate any duty he owed to the city and county, nor to give any information detrimental to its side of the cases.

Rehearing denied.