[No. 9761.  In Bank.—August 22, 1885.]

## IN RE W. B. TREADWELL, DISBARMENT.

| 67 | 353 |
| 107 | 82 |

ATTORNEY AT LAW—DUTIES. — On a review of the evidence, *held*, that the respondent was guilty of a breach of his duty as an attorney in appropriating to his own use money collected by him for his client.

ID.—DISBARMENT—CRIMINAL OFFENSE NOT NECESSARY. —In exercising the power of disbarment, the court deals with the attorney only as an officer of the court, investigating charges against him for the purpose of determining whether, under the proofs, he is a fit person to be allowed to continue to practice as an attorney and counsellor in the courts under the license which has been granted to him, and not for the purpose of adjudging whether he is guilty of the commission of a crime for which he ought to be convicted and punished; and where an attorney has been found guilty in the practice of his profession of acts indicating moral depravity, he may be disbarred by the court without previous conviction of a criminal offense.

PROCEEDING for the disbarment of an attorney. The facts are stated in the opinion of the court.

*G. E. Harpham*, and *J. Craig*, for Petitioners, cited *Sparr* v. *Vanderhayden*, 9 Johns. 253; 6 Am. Dec. 275; *Delano's Case*, 58 N. H. 5; 42 Am. Rep. 555; *Austin's Case*, 5 Rawle, 191; 28 Am. Dec. 662; *Dicken's Case*, 67 Pa. St. 169; 5 Am. Rep. 420; *Ex parte Wall*, 107 U. S. 265; *In the Matter of———, an Attorney*, 86 N. Y. 563; *Penobscot Bar* v. *Kimball*, 64 Me. 140; *Ex parte Bransall*, Coop. 829; *People* v. *Ford*, 54 Ill. 520; *Rice* v. *Commonwealth*, Mon. B. 484; *Mills' Case*, 1 Mann. 393; *In re Percy*, 36 N. Y. 651; *Bryant's Case*, 24 N. H. 155; *Burr's Case*, 1 Wheeler's Crim. Law, 503; *Leigh's Case*, 1 Munf. 481.

*A. C. Adams*, and *W. C. Belcher*, for Respondent, cited Code Civ. Proc. §§ 287–299; *Ex parte Smith*, 28 Ind. 47; *Redman* v. *State*, 28 Ind. 205.

MCKEE, J.—This is an original proceeding to disbar an attorney at law for misconduct in office, in fraudulently appropriating to his own use moneys collected by him for his client.

The record shows that Carl Haneke had employed the attorney in a transaction which involved the sale and transfer of a tract of land in Yolo County, to one Isaac Quinn. Quinn gave his promissory note for the purchase money of the land, payable in the sum of $2,450, and interest thereon from date of the note, payable quarterly in advance, to Haneke at the Bank of Cali-

fornia, and secured its payment by a mortgage trust deed upon the land.

Note and deed were executed and delivered to Haneke on the 26th of March, 1881. Possession of the deed Haneke retained, and the note he deposited in the Bank of California for collection.

After finishing the transaction in that way, Haneke settled with the attorney and paid him for his legal services, but under the authority of Haneke, the attorney continued to act in collecting the quarterly interest as it became due upon the note, and any payments that were made of the principal sum.

Between the date of the note and the month of December, 1883, each quarterly interest of the note as it became due, and $400 of the principal were collected and transmitted by the attorney to the bank, and were there properly applied to the payment of the note, and carried to the account of Haneke, who received and receipted for them. But in December, 1883, the attorney collected, in full, of the principal and interest then due, $2,102.61, for which he gave his receipt in the following words:

"$2, 102.61.                WOODLAND, CAL., Dec. 12, 1883.

"Received of Isaac Quinn, twenty-one hundred and two 61-100 dollars, to be applied in payment of his note of March 26, 1881, to Carl Haneke.                W. B. TREADWELL."

This money he did not transmit to the bank as he had done his prior collections. Upon receiving the money he deposited it in his own name in the Bank of Yolo, and used it as his own. Under oath he admits that within a few days after he had deposited the money he drew $400 of it, and used it for his own purposes; that within a week or ten days he obtained from the bank a certificate of deposit for $1,500 of it, payable to himself or order, on return of the certificate properly indorsed, and that the balance he kept and used.

It is claimed for him that he appropriated the money in that way by the authority and under instructions from a daughter of his client, at whose request he agreed to hold the money until an opportunity could be found for its investment in some way, so that it would yield, in the way of interest, a small monthly or quarterly income for the support of her father. And that when the daughter found an investment she wrote for the money and he sent her the $1,500 certificate of deposit properly indorsed

by himself, and at the same time borrowed from her the balance of the money at the same rate of interest that Quinn had paid on his note.

This defense rests altogether upon his own testimony. His testimony, given in his own behalf, tended to show that in March, 1883, he received from the daughter of his client a letter in the following words:—

"SAN FRANCISCO, March 27, 1883.

"MR. W. B. TREADWELL — *Dear Sir:* During my father's recent dangerous illness, he deemed it advisable to arrange business matters to his satisfaction. He therefore indorsed and assigned the promissory note of the trust deed to me, and consequently I shall sign all receipts for interest or money sent as payment on note hereafter. The trustees have been duly notified of the change.

"Will you have the kindness to inform Mr. Quinn of the fact, and request him when he forwards interest again to have the check at the bank payable to me? Father is much better, but, being over eighty years of age, he does not feel able to have the cares of business thrust upon him. Hoping these few lines may find your family in good health, I remain, yours truly,

"HARRIET A. WISE,

"516 Filbert Street."

He did not inform Mr. Quinn of the request contained in the letter, but he continued to make collections from him upon the note as usual. It is true, however, that the note was withdrawn from the bank by Haneke during his sickness, and after indorsement by him was again returned, after which Mrs. Wise drew from and receipted to the bank for all moneys which were collected and transmitted by the attorney for payment upon the note, prior to the month of December.

In connection with these facts the substance of the attorney's testimony, condensed to brevity, is this: "Before, or about the time I collected the principal and interest due on the note, I happened to meet Mrs. Wise at the Palace Hotel in San Francisco, and there informed her that Quinn was, or would be soon, ready to take up his note. This troubled her, because, as she expressed it, her father was old, very feeble, and childish, and looked to the regular payment of the interest on the note as

absolutely necessary to his comfort in his declining years, and she thought it advisable that knowledge of the payment of the note should be kept from him; therefore she 'proposed' to me, that, instead of transmitting the money to the bank, as usual, to be applied to the payment of the note, I should retain it in my possession until she or I could find some opportunity to invest it so as to make it interest-bearing; and in the mean time I could use the money to pay interest at the bank as usual, so as to have it appear that the matter was going all right."

After this alleged interview the attorney admits he never saw Mrs. Wise again. And the fact is, that before it became publicly known that the money had been collected, Mrs. Wise fell sick and was taken to the German Hospital where she died. But the attorney claims that, before her death, and soon after he had deposited the money in the Bank of Yolo, he began a correspondence with her as to the investment of the money, in one of the letters of which he sent to her address in San Francisco, by mail, the certificate of deposit of $1,500, by him properly indorsed, and at the same time wrote to her as follows: "As to the balance of the money, I will, if satisfactory, use it myself, and pay you the same rate of interest until you can use it otherwise, or I can find some other investment." "In answer to that letter she wrote to me acknowledging the receipt of the certificate, and at the same time asked me to send her $200 of the balance in my hands, if I could conveniently spare it," urging me at the same time to keep the matter open and pay the next instalment of interest at the bank. To that letter I replied "that it was not convenient to send the $200, but I would let her know in a day or two whether I could do so, and that I would attend to the payment of interest."

"Q.—You made an investment of the rest for her?

" A.— Yes, sir.

"Q.—Of $600?

" A.— Yes, sir. . . . . I had borrowed it myself, and had so stated in my letter; and she had agreed to it—it was agreed to by her. I was to pay the same rate of interest that Mr. Quinn had been paying until I should give it up or make some other investment."

All the letters of this asserted correspondence, says the attorney, are lost, and he testified to their contents from his recol-

lection. There was, of course, no explanation or contradictions of his statements by Mrs. Wise, she being dead. Upon his own testimony, therefore, as to the authority from and correspondence with Mrs. Wise, rests his exculpation of himself, and we regret to find that his attempted exculpation is not founded in fact.

As fact, the attorney admits the use of the money for his own purposes, except the sum of $1,500, which he claims to have sent to Mrs. Wise. But it is a fact that Mrs. Wise never received the certificate of deposit, nor had it cashed by any one for her. On the contrary, the evidence proves beyond a reasonable doubt that on the day after the attorney obtained the certificate from the Bank of Yolo he was in San Francisco, and on the next day between the hours of 12 M. and 1 P. M., he, in person, presented the certificate to the Bank of California, properly indorsed by him, and received for it a cash payment and a certificate of deposit for $1,200, payable to himself, upon his indorsement, on which he soon afterwards received the money from the Bank of Woodland and used it. It follows that Mrs. Wise never received from the attorney any of the $2,102 collected by him. In fact, the non-receipt of any portion of the money increased her sorrows and served to embitter her last days. The attorney therefore held back the entire sum which he collected, and used it for his own purposes, under circumstances which make his conduct inexcusable and unprofessional.

The attorney admitted "that it was wrong to use the money, but he supposed that he could replace it whenever they wanted it, knowing that they wanted it kept out at interest." His good intentions, however, neither excuse nor mitigate his official conduct. As a lawyer, he knew that he could not professionally enter into a secret arrangement to conceal from his client a knowledge of the collection of the money, and that even under the color of such an arrangement, assuming that such had been made, it was not allowable for him to deal with the money in such a way as to injuriously involve the rights of others standing in such a relation to it as to be affected by an unauthorized and unlawful use of it, nor to convert it to his own use. He knew that it was a duty which he owed to himself, his client, and the man from whom he had collected the money, to pay it

over as soon as he received it, by transmitting it to the bank where the note was deposited, and where it would be properly applied to the credit of the note, and turned over to the account of the owner. In failing to discharge that duty, and in converting the money to his own use, he violated his oath of office and abused his trust.

As to the power of the court to strike the name of an attorney from the roll of attorneys and counsellors of the court for such official misconduct there is no question. Section 287 of the Code of Civil Procedure provides: "An attorney and counsellor may be removed or suspended by the Supreme Court, . . . . for either of the following causes arising after his admission to practice:—

"1. His conviction of a felony or misdemeanor involving moral turpitude, in which case the record of conviction is conclusive evidence.

"2. . . . . Any violation of the oath taken by him or of his duties as such attorney and counsellor."

In the exercise of this power the court deals with the attorney only as an officer of the court in investigating charges against him for the purpose of determining whether, under the proofs, he is a fit person to be allowed to continue to practice as an attorney and counsellor in the courts under the license which has been granted to him, and not for the purpose of adjudging whether he is guilty of the commission of a crime for which he ought to be convicted and punished. That can only be done in a criminal court of competent jurisdiction by due process of criminal law. Previous conviction of a crime is not necessary to a proceeding to disbar an attorney. If an attorney be found by a court guilty of acts indicating professional moral depravity, the court can, without previous conviction of a criminal offense, prevent the repetition of such official acts, by taking away the license under which they have been committed. This it will do not only in the interest of justice and of the public, but of the legal profession, which, like the court itself, ought to be free from all suspicion. "It is indispensable that an attorney be trustworthy. And he is not trustworthy if he is capable of improperly applying to his own use his client's money, whether he intends to return it or not." (*Delano's Case*, 58 N. H. 5.)

It is ordered that the name of the attorney be stricken from the roll of attorneys and counsellors of the court, and that he be precluded from practicing as such attorney and counsellor in any of the courts of the State.

MORRISON, C. J., ROSS, J., MYRICK, J., THORNTON, J., and McKINSTRY, J., concurred.