---

In re O——.

*February 4 — March 12, 1889.*

*Attorney at law: Disbarment: Evidence: Good moral character: Conversion of client's money: Findings: Acting against former client: Jurisdiction.*

1. Even where the charges of professional misconduct upon which an attorney is disbarred are not of a criminal nature, they should be established by a preponderance of satisfactory evidence.
2. As " good moral character " is a condition precedent to admission to the bar, so it is a requisite condition for the rightful continuance in the practice of the profession.

In re O———.

3. The fact that an attorney collected and wrongfully converted moneys belonging to his clients, and then failed to pay them over after repeated demands, especially where his attempt to retain such moneys was a subterfuge and in bad faith, is sufficient to authorize his suspension if not disbarment.

4. The misconduct which will warrant the suspension of an attorney is not limited to acts committed strictly in a professional charac-ter, but extends to all such misconduct as would have prevented an admission to the bar.

5. In proceedings to disbar an attorney the court may find the facts proved by evidence admitted without objection, even though such facts were not stated in the formal charges filed.

6. It is sufficient to warrant the disbarment of an attorney that, hav-ing acted for the claimant in a contest concerning the validity of a homestead claim, he afterwards instigated and conducted in be-half of another person a second contest against his former client, involving the same subject matter and based largely upon the same facts, and in such second contest testified as a witness against his former client and used the information acquired by means of his former employment.

7. In proceedings instituted in the court of his residence, such court may disbar or suspend an attorney for professional misconduct be-fore officers of the United States land office.

APPEAL from the Circuit Court for *Eau Claire* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

It appears from the record that prior to August 6, 1888, O——— was a member of the bar of Eau Claire county; that between July 27, 1887, and September 10, 1887, the bar association of that county investigated certain charges of improper and unprofessional conduct of said O———, and thereupon directed three of its members, *Thomas F. Frawley, Lelon A. Doolittle,* and *Louis R. Larson* to pre-sent such matter to the circuit court for that county; that the said *Frawley, Doolittle,* and *Larson* thereupon presented to the judge of said court their verified petition in said matter, September 14, 1887, whereupon the said judge or-dered said O——— to show cause before said court Septem-

ber 26, 1887, why his license to practice as such attorney should not be revoked and he be disbarred and his name stricken from the roll of attorneys; that said petition and order to show cause was served on said *O——* September 15, 1887; that said petition contained a general charge and thirteen specific charges; that within the time required the said *O——* put in a verified answer to said several charges; that upon the trial of the issues so formed the court found in favor of said *O——* on all of such specific issues except the third, fourth, sixth, ninth, and twelfth, upon each of which he was convicted; that the said general charge and specific charges upon which he was so convicted, were and are as follows:

"General Charge: That said *O——* is an attorney at law, residing in the city and county of Eau Claire, duly licensed and admitted to practice and actively practicing as such in the circuit court of Eau Claire county and in the circuit and inferior courts of this state, and is a member of the bar association of Eau Claire county, and that while so residing in said Eau Claire county and a member of said bar association, and while engaged in the practice of law, has been guilty of general unprofessional conduct, of numerous acts unbecoming an attorney and member of said association, and among others, in particular instances, as follows:"

"Charge 3.  That said *O——*, while engaged in practice as an attorney at Eau Claire, Wisconsin, on or about the middle of February, 1885, in an action pending in the circuit court for said county, wherein one Jules Jacobson was plaintiff and Adolph Hoffman was defendant, and George H. Murray was garnishee, and wherein said *O——* was attorney for said plaintiff, procured and induced said Murray to intrust and pay to him, said *O——*, the sum of $30, the same being the alleged liability of Murray in said action.  That the same was paid to *O——* by said

In re O——.

Murray upon the representation made to him by said O——
as an attorney that he would represent him as his attorney
in said matter and look out for and guard his interests
therein, and that payment to him of said sum would dis-
charge said Murray's liability therein and liquidate and pay
the indebtedness of said Murray to said Hoffman, and that
he, said O——, would in all respects as attorney protect
and defend the rights of said Murray in said action, and so
use and apply the said money so received by him as to dis-
charge and pay the said indebtedness due to said Hoffman.
That in March, 1885, said action aforesaid was discontinued
and dismissed. That said O—— did not look out for and
protect the interests of said Murray therein, and did not
use or employ said money so received by him or any part
thereof to pay or discharge the indebtedness in favor of
said Hoffman, and said Murray was compelled to pay to
said Hoffman the entire amount of his indebtedness to him,
and said O—— has ever since neglected and refused to re-
fund or pay to said Murray the sum of $30 or any part
thereof, except the sum of $2, and although the same of
him has been frequently demanded he unlawfully and
wrongfully converted the same to his own use.

"Charge 4. That on or about the 24th day of November,
1885, and while practicing as an attorney in said county
of Eau Claire, said O——, as an attorney, was intrusted
by one Manley Harriman with the sum of $30 for the
express purpose of safely keeping and holding the same
for him, said Harriman, until he should call for the same.
That said O—— unlawfully and wrongfully converted the
same to his own use, and has refused and neglected to re-
turn the same or any part thereof to said Harriman, al-
though of him often demanded, except the sum of $24.50,
which part has been so repaid by him in small sums varying
from one to ten dollars, and the greater portion whereof
has been so returned within a short time last past."

"Charge 6. That said O——, while practicing as an attorney in said city of Eau Claire in the year 1885, was retained and employed by one Charles Erickson to render and perform for him generally the services of an attorney, and was by said Erickson specially employed to prepare and conduct for him his defense in a contest before the register and receiver of the United States land office in the city of Eau Claire, instituted by one Chris Brown against him, said Erickson. That in pursuance of said retainer and employment said O—— counseled with said Erickson and his witnesses in said matter, and appeared before said register and receiver and conducted the defense of said contest on the day fixed for the hearing thereof, on the 26th day of August, 1885. That for the said services so rendered and performed by said O—— for said Erickson in said matter, said O—— received of said Erickson pay therefor. That thereafter, on the 24th day of November, 1885, said O—— procured one Adelbert D. Moon to file an affidavit of contest before the register and receiver of the United States land office against said Erickson on his said homestead aforesaid, upon the same grounds and for the same reasons on which the said contest of August, 1885, was based. That thereafter, in December, 1885, said O—— appeared in said land office, and as attorney conducted the contest on the part of said Moon in said matter, and was sworn and testified as a witness in the proceedings on the part of said Moon to facts and circumstances that came to his knowledge while attorney and counsel of said Erickson as aforesaid. That from an adverse decision rendered against said Moon by the register and receiver on said hearing, said O—— appealed on behalf of said Moon to the commissioner of the United States land office, before whom said matter is now pending on said appeal, and undetermined."

"Charge 9. That said O——, unmindful of the duties of

an officer of the court and in violation of his oath of office, while practicing as an attorney at Eau Claire, Wisconsin, during the fall of 1882 and the winter of 1882 and 1883, was guilty of unprofessional and criminal conduct as an attorney in that he did during said time collect for one Alfred Kahn of said city, and from August Rahn of Altoona in said county, the sum of $79.59, which said sum so collected was the property of said Alfred Kahn; and that he converted the same to his own use. That the collection of said sum was intrusted to him by said Kahn with the understanding and agreement that said sum was to be collected for a commission of ten per cent. That said O—— collected the same without any action therefor, and after collecting and converting said sum to his own use denied that he collected the whole or any part thereof. That said Kahn has since succeeded in collecting from said O——, through the efforts of A. C. Larson, Esq., and L. M. Vilas, Esq., a portion of said sum of $79.59, but that over $30 thereof is still retained by said O——."

"Charge 12. That on or about the 10th day of April, 1884, said O——, while acting in his professional capacity as the attorney of Andrew Hegdale, collected for said Andrew Hegdale, of one Peter Truax, the sum of $18.43. That said sum when collected was the property of said Andrew Hegdale, but that O—— on the day aforesaid converted the same to his own use."

The answer of O—— to these several charges consisted of denials and explanations which if true would have expurgated him of the several offenses thus charged. Upon the trial of such issues, the court on May 1, 1888, filed its findings in writing, as follows:

"As to charge three, I find the facts as follows: In February, 1885, one Jules Jacobson commenced an action against Adolph Hoffman, in which George H. Murray, with others, was summoned as garnishee. That in said

In re O——.

action respondent appeared as attorney for the plaintiff. That upon the service of the garnishee summons upon Murray, it appears that he, Murray, was indebted to defendant, Hoffman, in the sum of $30, and, not questioning his indebtedness and desiring to avoid trouble, he paid over to the respondent the said sum, who received it for the purpose of paying it upon the judgment it was expected would be obtained in the original action. For some defect in the proceedings no such judgment was obtained and such garnishee proceedings were dismissed. It then became the clear duty of respondent to return to Murray the $30. Instead of doing so, however, he converted the same to his own use. He repeatedly promised to repay the money to Murray, and Murray having since died he has repeatedly promised to pay his widow, but has failed to keep his promise, and as a result, Murray, who is a man of very limited means, was compelled to pay the debt to Hoffman or his representatives. The respondent attempts to justify his cause by saying that he got Jacobson's consent to use the money. This is no excuse. The money belonged to Murray and not to Jacobson. Respondent received it, as his receipt shows, as attorney for both parties, that is, to hold it for Murray until it was legally applied to the payment of Jacobson's judgment, when it would become the money of Jacobson, and Murray would thereby be relieved from his debt to Hoffman. Respondent's conduct in this particular has caused a serious loss to a man who could illy afford to sustain it, and deprived his widow of greatly needed means of support. I therefore find respondent guilty of dishonest and unprofessional conduct as charged.

" As to charge four, the evidence shows the facts to be as follows: On or about the 24th day of November, 1885, one Manley Harriman came into the office of respondent, having in his possession about $35 in money. That respondent suggested to him that it would not be safe to carry that

amount of money, and that it would be better to leave it
with him, he promising to lock it in his safe, keep it, and
return it when called for.    That said Harriman, agreeable
to such suggestion, did leave $30, and took from respondent
a receipt reading as follows:  'November, 24, 1885.  Re-
ceived of Manley Harriman $30.   (Signed) ———.  O———.'
That almost immediately after such money was deposited
the respondent took it and spent it without Harriman's
consent, and did not repay it until he was repeatedly im-
portuned for payment, and then making payments in small
sums, the last payment, $5.50, not being made until after
the commencement of these proceedings.   The respondent
claims that this transaction was a loan from Harriman to
him.    The evidence fails to sustain that theory.    All the
circumstances appearing show a bailment and not a loan.
Had it been an honest loan there is no reason why the re-
ceipt should not have said so, and many reasons why it
should.    It is clear that Harriman did not understand it to
be a loan, and equally clear that respondent did not intend
to have him so understand it.    The receipt is artfully writ-
ten by respondent, as it would seem, so as to conceal re-
spondent's real intention to use the money and thereafter
claim it as a loan.    It looks as if there was a premeditated
design to obtain the money ostensibly as a bailor, and then
to justify its use by calling it a loan.    The respondent's
counsel insists that whatever the moral aspect of this trans-
action may be, this court has no power to entertain the
charge, because the respondent's acts were not in his pro-
fessional character, as the relation of attorney and client
did not exist between respondent and Harriman at the
time.    I do not so understand the law.    I understand that
if an attorney is shown to be guilty of such gross miscon-
duct as shows him to be unfit for the honest discharge of
the trust reposed in him, it is the right and duty of the court
to interfere.

" As to charge six, there is but little real conflict in the testimony as to the main facts.  It appears that on the 20th day of July, 1885, one Erickson was in possession of, claiming under the homestead law, the E. ½ of the S. E. ¼ of section 8, township 27, range 18, his claim dating from June 20, 1884.  That on the 20th day of July a contest was initiated by one Christ Brown against Erickson to procure a cancellation of such homestead claim.  In such proceedings respondent appeared as counsel for Erickson, receiving as part payment for his services $10 in cash.  That while so employed respondent, at the request of Erickson, in order to ascertain the condition of the premises, visited them on two occasions pending such contest, for which services he charged Erickson.  That during the pendency of such contest he had repeated conferences with his client as to his residence and, as incidental to that question, where he had cast his vote at previous elections.  Such contest never came to a hearing, but was settled or abandoned, thus leaving Erickson in the enjoyment of possession under his homestead claim; that respondent presented a bill of $—— for balance on his services, which Erickson declined to pay, claiming that respondent had been fully paid, whereupon respondent threatened, in case such bill was not paid, that he would take measures to deprive him of his homestead.  Such threats not proving effectual for compelling payment, a second contest was on the 2d day of November, 1885, inaugurated in the name of Adelbert Moon against Erickson, on complaint being made alleging an abandonment of such homestead.  In this latter contest the respondent changed sides, and appeared for the contestant Moon.  The two contests were concerning the same property, and involved in part at least the same questions of fact, because between the ending of the first contest and the beginning of the second six months had not elapsed, and under the provisions of the homestead law a charge of abandonment·

In re O——.

can only be sustained by showing nonresidence for at least six months at one time.

"The affidavit on which the Moon contest was initiated was made by the respondent, and upon the case coming on for trial it was conducted by respondent on the part of Moon against the objections of Erickson, and not only that but the respondent on the part of Moon went on the stand as a witness. There is some conflict as to precisely what he swore to, but there is no dispute that he swore to the condition of the premises as he saw them at the time he was paid by Erickson to go and see them, thus using the information acquired at Erickson's expense against him. The evidence satisfied me that he swore directly to statements claimed to have been made by Erickson to him while the relation of counsel and client existed between them, or that he called attention by way of interrogatories to such statements claimed to have been made at the time. The witnesses are not very clear on this point, but enough appears to show that he used the information acquired by the confidence of Erickson to defeat him in the second contest. He was a principal witness for Moon, giving extended testimony, a great part of which referred directly to matters said to have transpired during the first contest. The evidence further clearly shows that the second contest was not only conducted but was instigated by the respondent, and that but for him it would have never been commenced. That he was influenced in such action by the fact that Erickson had not paid him his fees, and was using the contest in pursuance of previous threats to extort such payment, thus being guilty of a species of blackmail. We cannot countenance such methods of collecting debts, but must hold the conduct of defendant to have been unprofessional and disgraceful, violating every principle of legal ethics, and tending to impair the confidence of the public in the members of the legal profession.

"As to charge nine, I find the respondent, during the fall and winter of 1882 and 1883, collected for one Alfred Kahn $79.59, said collections having been paid in small sums. That by the contract with Kahn he was to receive ten per cent. of the amount collected for his fees. That after such collection was made he failed to pay it over, but used the same as his own. That he subsequently paid $30, still leaving due and unpaid $49.59. The respondent's claim is that no bargain was made as to the amount of his fees, and that his services were worth fifty per cent. of the amount collected; and he alleges that he has always been ready and willing to settle on that basis. Were this a *bona fide* difference between the respondent and his former client, this court would have no right to interfere, but should leave the parties to settle their dispute in the usual way by action. But Mr. Kahn's testimony is positive that ten per cent. was the agreed rate of compensation, and the subsequent conduct of the respondent tends strongly to corroborate him and to show that the claim now made by respondent is an afterthought and not made in good faith. It seems that for years after the collection was made counsel in behalf of Mr. Kahn endeavored to induce respondent to settle the claim, and even threatened him with a prosecution for embezzlement, and during all that time no claim was made such as is here made, and no one disputed the amount due from respondent to be as now claimed by the testimony of Kahn. This conduct on the part of respondent is entirely inconsistent with the version he now gives of the transaction.

"Charge number twelve is fully sustained by the evidence. The respondent collected of Peter Truax for one Ole Hegdale $68.43, and instead of paying it over used it for his own purposes without the consent of his client. Respondent admits making this collection, but alleges that after it was made and before the money was used Hegdale

came into his office and loaned it to him. The absence of any note, receipt, or other paper showing this transaction,— this change in their relation from attorney and client to that of debtor and creditor,— is very suspicious. An attorney borrowing money already in his hands from a client in the absence of witnesses should certainly, as a matter of ordinary prudence, make some clear record of the transaction, so as to show that the matter was fully understood between them. But the subsequent conduct of the respondent, to my mind, clearly establishes the falsity of this claim. · Soon after the collection Hegdale put the matter in the hands of counsel, who has testified to repeated interviews on the subject. He says that after asking for the money, as money collected by the respondent, for, he thinks, as much as a dozen times, he commenced a suit for trover and conversion in the municipal court, and that on the trial of that action he learned for the first time that respondent claimed to have borrowed the money. The issue was tried in municipal court and decided against the respondent's claim, and a judgment in tort rendered against him. I therefore find there was a conversion by respondent of the money so collected.

"It is not necessary to mention the other charges, as I do not find them sustained.

"Finding as I do as to the above facts, it follows that the respondent must be held to have testified falsely in regard to the several transactions above named. He would have stood much better in the estimation of the court had he frankly told the truth in regard to them, instead of trying to shield himself by falsehood, as I am compelled to believe he has. The chief object of this proceeding is not to punish the respondent but to protect the public from imposition. An attorney bears with him the certificate of the court that he is of good moral character and a fit person to be trusted with the delicate and responsible duties of a mem-

ber of the legal profession. This certificate the public has a right to rely upon, and to presume its holder to be a person of integrity and honor. Hence, when it is made to appear that he has been guilty of acts which show him to be so deficient in honesty as to be unworthy of confidence, it is the duty of the court to withdraw its certificate. We owe this duty alike to the public and to the bar. I am not unmindful of the serious consequences to respondent of an order disbarring him, nor lacking in sympathy for those who must suffer with him, but the evidence shows such repeated acts of unprofessional conduct on his part that I do not feel at liberty to pass them by and to continue to hold him out to the world as a fit and proper person to practice law. It will therefore be ordered that the respondent O—— be expelled from the bar of this court, and that his name be stricken from the roll of attorneys. It is, however, further ordered that after the lapse of two years from the date of entry of this order, said O—— may make application to be reinstated, and upon a satisfactory showing to the court of good conduct between the said date of filing and the said application he may be so reinstated; and let it be ordered accordingly."

From the order entered thereon accordingly, the said O—— appeals.

For the appellant there was a brief by *James Wickham*, and oral argument by *Mr. Wickham* and *B. W. Jones*. They contended, *inter alia*, that to warrant a conviction in a proceeding of this kind upon charges of a criminal nature a mere preponderance of evidence is not sufficient. *In re Baluss*, 28 Mich. 507; *In re Houghton*, 67 Cal. 511; *State v. Tunstall*, 51 Tex. 81; *People ex rel. Shuffeldt v. Barker*, 56 Ill. 299; Weeks on Attorneys, 156; *People ex rel. Miller v. Harvey*, 41 Ill. 277; *In re Orton*, 54 Wis. 386. The misconduct complained of in the fourth charge was not committed in a professional capacity, and in such case the

attorney's name should not be stricken from the roll unless the charge is of a criminal nature and of such a character as to render him totally unfit to be an officer of the court, as in cases of forgery, perjury, or theft; and then he cannot be disbarred, if he does not admit the offense, without being indicted, tried, and convicted. *Anonymous*, 7 N. J. Law, 162; *People ex rel. Hughes v. Appleton*, 105 Ill. 474; *People ex rel. Noyes v. Allison*, 68 id. 151; *Dickens' Case*, 67 Pa. St. 169, 5 Am. Rep. 420; *Ex parte Steinman*, 95 Pa. St. 220; *In re Husson*, 62 How. Pr. 358, and cases cited; Weeks on Attorneys, 135. From the finding on the sixth charge it is very difficult to ascertain just what the court considered was the improper conduct of the appellant in relation thereto. Such a finding cannot sustain an order for disbarment, for an attorney has a right to know on what ground he is disbarred. *State v. Watkins*, 3 Mo. 480; *Perry v. State*, 3 Greene (Iowa), 550. No charge had been made against the appellant to justify a finding of blackmail, and he cannot be disbarred on a charge for which he has never been tried. *In re Orton*, 54 Wis. 379. The sixth charge, and in fact the whole proceeding, reduces itself to the question whether the appellant had the right to act as the attorney for Moon on the second contest, having been retained as the attorney for Erickson in the former contest, which was abandoned before trial. Even if it appeared that he had, in the course of his employment, obtained knowledge which he could use against his former client, that fact would not even be ground for restraining him from acting against such former client. Weeks on Attorneys, 221; 1 Wait's Act. & Def. 448; *Price v. G. R. & I. R. Co.* 18 Ind. 137. And even if there was ground for restraining him from acting as attorney on that second contest, it by no means follows that such action is ground for disbarment. An attorney may not be disbarred for every mistake in law or in professional ethics, but only for such gross acts of un-

professional conduct as render his continuance in practice incompatible with a proper respect of the court for itself, and render the attorney totally unfit to be an officer of the court. Weeks on Attorneys, 143; *In re Orton*, 54 Wis. 382. As to the conduct of the appellant in proceedings before the land officers, the state courts have no jurisdiction, except in so far as it affects his moral character. *In re Knott*, 71 Cal. 584.

*T. F. Frawley*, for the respondents (the petitioners), argued, among other things, that the appellant was guilty of gross dishonesty and unprofessional conduct in procuring from Murray and Harriman the sums of money in the charges specified, and converting the same to his own use; and for this dishonest and corrupt practice his name should be stricken from the roll. *In re Davies*, 93 Pa. St. 116; *In re Percy*, 36 N. Y. 651; *Baker v. Commonwealth*, 10 Bush, 592; *People ex rel. Cutler v. Ford*, 54 Ill. 520. He violated his official oath and was guilty of dishonest conduct in refusing to pay to Kahn and Hegdale, his clients, the money belonging to them. *Slemmer v. Wright*, 54 Iowa, 164; Weeks on Attorneys, 263; *Voss v. Bachop*, 5 Kan. 67. He violated his official oath and betrayed the confidence reposed in him as an attorney by accepting fees from conflicting parties in the Erickson case, and by improperly and to the prejudice of Erickson employing the knowledge which had been confidentially entrusted to him. *In re Cowdery*, 69 Cal. 32; 1 Monell's Pr. 182, 183, and cases cited; *In re Whittemore*, 69 Cal. 67; *Herrick v. Catley*, 1 Daly, 514; Weeks on Attorneys, 152; *Mason's Case*, 1 Freem. 74; *Berry v. Jenkins*, 3 Bing. 423; *State v. Halstead*, 73 Iowa, 376; *Henry v. Raiman*, 25 Pa. St. 354; *Galbraith v. Elder*, 8 Watts, 81; *Dietrich v. Mitchell*, 43 Ill. 40; *Brown v. Payson*, 6 N. H. 443; *Robson v. Kemp*, 5 Esp. 52; *Price v. G. R. & I. R. Co.* 18 Ind. 137; *White v. Huffaker*, 27 Ill. 349; *Gaulden v. State*, 11 Ga. 47; *State ex rel. McCormick*

*v. Winton*, 11 Oreg. 456; *Ex parte Wall*, 107 U. S. 266. As to the jurisdiction of the court, see *Ex parte Wall, supra; Anderson v. Bosworth*, 15 R. I. 443; *In re Aitkin*, 4 Barn. & Ald. 47, 49; *Grant's Case*, 8 Abb. Pr. 357; *Ex parte Saats*, 4 Cow. 76; *Ex parte Cripwell*, 5 Dowl. Pr. Cas. 689; *De Woolf v.* ——, 2 Chit. 68; *In re Knight*, 1 Bing. 91; *Tharratt v. Trevor*, 7 Exch. 161. The power to remove an attorney is incidental to all courts, and unless it be clearly exceeded and abused by the circuit court, this court should not interpose, as it cannot decide with the same means of information that the court below was possessed of. *Rice v. Commonwealth*, 18 B. Mon. 472; *Ex parte Burr*, 9 Wheat. 529; *In re Secombe*, 19 How. 9.

CASSODAY, J. This court has held, in effect, that where the charges of professional misconduct upon which the accused is disbarred are such as would, if true, subject him to criminal prosecution, the same "should be established by clear and satisfactory evidence, and cannot rest in doubtful and uncertain inferences." *In re Orton*, 54 Wis. 386. But even where such charges are not of a criminal nature, yet we apprehend that, in order to justify disbarment, they should be established by a preponderance of satisfactory evidence. Here the charges were specific. The hearing was adjourned from time to time. The accused had ample opportunity for defending himself against the several charges made. In the conflict of evidence the trial court had advantages for ascertaining the truth which we do not possess. The findings of fact, therefore, in so far as they seem to be supported by evidence, must be received as verities in the case. Such facts need not be repeated nor stated in detail. It is enough to say, that a careful examination of all the testimony forces us to the conclusion that the several findings of fact against the accused given above are substantially supported by the evidence.

---

In re O———.

---

The difficulties and perplexities which frequently beset an attorney in active practice are not underestimated. In the language of another court: "His professional life is full of adversaries. Always in front of him there is an antagonist, sometimes angry and occasionally bitter and venomous. His duties are delicate and responsible, and easily subject to misconstruction." *In re Eldridge*, 82 N. Y. 167. But we feel constrained to add that there is a spirit of fairness and magnanimity among members of the bar, not surpassed in any other profession. Besides, experience and observation warrant the assertion that no respectable bar, as a body, would for a moment tolerate the persecution of one of its members. There would, as a general thing, be more danger of laxity in the opposite direction.

To entitle a person to practice law in Wisconsin, he must, in addition to the other requisites, be "of good moral character." Subd. 3, sec. 2586, R. S.; ch. 144, Laws of 1881; ch. 63, Laws of 1885. As a good moral character is a condition precedent to admission to the bar, so it is a requisite condition for the rightful continuance in the practice of the profession. *Ex parte Brounsall*, 2 Cowp. 829; *Penobscot Bar v. Kimball*, 64 Me. 146; *Strout v. Proctor*, 71 Me. 290; *Delano's Case*, 58 N. H. 5, 42 Am. Rep. 556; *In re Davies*, 93 Pa. St. 120; *Ex parte Wall*, 107 U. S. 280. The words "good moral character" are general in their application, but of course they include all the elements essential to make up such a character. Among these are common honesty and veracity, especially in all professional intercourse. The several acts of which the accused was found guilty all related to such intercourse. The ninth and twelfth findings are each to the effect that the accused collected and wrongfully converted moneys belonging to his clients, and then failed to pay them over after repeated demands. Besides, it was in effect found that his attempt to retain such moneys was a subterfuge and in bad faith.

These things of themselves were sufficient to authorize suspension if not disbarment. *In re Davies, supra; In re Temple,* 33 Minn. 343; *Jeffries v. Laurie,* 23 Fed. Rep. 786; *S. C.* 27 Fed. Rep. 195; *In re Treadwell,* 67 Cal. 353; *Slemmer v. Wright,* 54 Iowa, 164; *People ex rel. Hungate v. Cole,* 84 Ill. 327; *People ex rel. Att'y Gen. v. Murphy,* 119 Ill. 159; *State ex rel. McCormick v. Winton,* 11 Oreg. 456; *In re Moore,* 72 Cal. 359.

As to the third finding, it is said that the money was used by the consent of his client. But the money did not belong to his client. The accused received it from the garnishee by reason of the confidence reposed in him as an attorney in the case. That confidence was misplaced, and by reason of it the garnishee was compelled to pay the money over again. Such professional misconduct is just as reprehensible as though he had used his client's money without consent and then failed to pay it over when demanded.

As to the fourth finding, it is said that the accused did not receive the money in the course of his business as an attorney, but merely as bailee, and hence that his wrongful conversion of it does not subject him to disbarment or suspension. Cases are cited which seem to sustain such contention, but we decline to follow them. The better rule seems to be, that the misconduct requisite for such suspension is not limited to acts committed strictly in a professional character, but extends to all such misconduct as would have prevented an admission to the bar. This is sustained by one class of the cases above cited. See, also, *Re Hill,* L. R. 3 Q. B. 543; *In re Blake,* 3 Ellis & Ellis, 34.

But the most serious finding against the accused is to the effect that after having successfully defended his client Erickson against a contest for the cancellation of his claim to his homestead, before the register and receiver of the United States land office at Eau Claire, made by one

Brown, and received part payment for his services, he threatened Erickson that in case the balance of his bill for such services should not be paid he would take measures to deprive him of his homestead, and that, as such threats were ineffectual, and for the purpose of coercing such payment, he inaugurated a new contest against Erickson in the name of one Moon for the cancellation of the same homestead claim, based largely on the same facts, and in which second contest he appeared not only as attorney but as a witness for Moon and against his former client.    Exception is taken because such threats and attempted coercion were not contained in the charges.    Proofs were made of such threats, however, without objection, and hence the court was justified in making such findings.    But the mere finding that the accused thus turned against his client is sufficiently serious for the purposes of this case.    The rights of litigants and the ends of justice demand the most implicit confidence in all legitimate professional intercourse between attorney and client.    *Queen v. Cox*, 14 Q. B. Div. 153.    In such intercourse the client should feel free to disclose the weak points of his case as well as the strong ones.    This he cannot feel at liberty to do if his attorney is liable to turn up against him in a similar case based on substantially the same facts.

It may be said that an attorney is not obliged to continue in the service of his client without pay.    However this may be, he certainly is not at liberty to desert his client and take up against him in the same cause or a similar cause based upon substantially the same facts, for the purpose of getting better pay or even any pay.    To allow such change of sides would reduce the attorney to a mere mercenary, always open for employment by the highest bidder.    It would compel the poor man to surrender his supposed rights without contest, or enter into competition as a bidder for any legal talent with his more wealthy opponent.    It would

In re O———.

supplant the confidence which clients rightfully have in their counsel by a baneful suspicion and distrust. Eminent professional learning and ability will naturally command appropriate compensation; but professional integrity is not the subject of purchase, sale, or traffic. Such integrity is absolutely essential to the continued usefulness of the profession. Its untarnished preservation is as essential to the honor of the bar as it is beneficial to the public. These views are well supported by the authorities. *State v. Halstead*, 73 Iowa, 376; *People v. Spencer*, 61 Cal. 128; *In re Cowdery*, 69 Cal. 32; *In re Whittemore*, 69 Cal. 67; *Comm. v. Gibbs*, 4 Gray, 146.

It is strenuously urged that the trial court had no jurisdiction to disbar or suspend for unprofessional conduct before the officers of the United States land office. But this is not a proceeding for contempt. The issues involved the accused's professional conduct, instituted in the court of his residence. In such a case we perceive no good reason for such limitation upon such jurisdiction. It has been held that an appellate court may take original jurisdiction for professional misconduct in the trial court or before a judge thereof. *In re Whitehead*, 28 Ch. Div. 614; *People ex rel. Elliott v. Green*, 7 Col. 237, 49 Am. Rep. 351. The findings of the trial court are sufficient to properly justify the condemnation of the accused in taking up against his client. As indicated by the trial court, these proceedings are not so much to punish the accused as to protect the public from imposition. The true lawyer has been rightfully termed a minister of justice, and he should never forget the requirements of his calling, nor allow his professional integrity to be tampered with.

In view of the conditions imposed by statute upon admission to the bar, the small amounts converted under claims of right, the payment of some of them, the age of the accused, and the confidence entertained of his reformation,

this court has concluded to so far modify the order appealed from as only to suspend him from practice during the two years named therein.

*By the Court.*— The order of the circuit court is reversed, and the cause is remanded with directions to enter such modified order as indicated. No costs allowed to either party in this court, except the appellant is to pay the clerk's fees.